[No. S004662. Crim. No. 24342. Apr. 5, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM JOHN CLARK, Defendant and Appellant.

## COUNSEL

Eric S. Multhaup and Melissa W. Johnson, under appointments by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Arnold O. Overoye, Acting Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette and Josanna Berkow, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EAGLESON, J.**—Defendant was convicted by a jury in the Los Angeles County Superior Court of the rape of his former wife, in violation of Penal Code section 261, subdivision (2)[1] (count I); the first degree murder of David Gawronski (§§ 187/189) (count II); the attempted second degree murder of Ava Gawronski and Sara Gawronski (§§ 664/187) (counts III & IV); and arson (§ 451, subd. (a)) (count V). The jury also found true

---

[1] All statutory references are to the Penal Code unless otherwise specified.

allegations that the murder had been committed under special circumstances as a murder by means of explosives (§ 190.2, subd. (a)(6)) and in the commission of arson (§ 190.2, subd. (a)(17)(viii)), and an allegation that defendant inflicted great bodily injury on Ava Gawronski (§§ 12022.7 & 1203.075) in the attempted murder.

The jury was excused when it deadlocked on the appropriate penalty and was unable to return a verdict. A second jury was empaneled (§ 190.4, subd. (b)), which returned a verdict of death. The court denied defendant's application for modification of the verdict and imposed the penalty of death for the murder; a consecutive upper term of eight years (§ 667.6, subd. (c)) for the rape of his former wife; the upper term of nine years with a three-year enhancement for the attempted murder of Ava Gawronski and the great-bodily-injury finding; two years, representing one-third of the middle term, for the attempted murder of Sara Gawronski; and two years and four months, one-third of the middle term, for the arson. The terms were to be consecutive, the rape term was designated a subordinate term, and the determinate terms were stayed pending imposition of the death penalty and permanently thereafter.

This appeal is automatic. (§ 1239, subd. (b).)

Having considered defendant's many claims of error, we find merit only in his assertions that the delivery-of-explosives special circumstance may not be applied to his conduct, and that one determinate term must be stayed. We shall strike the special circumstance found under section 190.2, subdivision (a)(6), and modify the judgment insofar as it fails to stay the arson term pursuant to section 654. In all other respects the judgment will be affirmed.

## SUMMARY

The rape of defendant's former wife occurred on the evening of November 19, 1981. She admitted defendant to her apartment when he told her that his mother was very ill. He then forced her to submit to sexual intercourse.

The other offenses were committed on January 6, 1982, when defendant threw gasoline into the home occupied by David and Ava Gawronski and their infant daughter Sara, and ignited the gasoline vapors with highway flares. David, who suffered second- and third-degree burns over 90 percent of his body, died on January 14, 1982. Ava was so seriously burned that she was hospitalized for 10 months, lost her fingers and nose, and suffered

additional permanent injuries. The child was rescued unharmed by a neighbor's heroic action.

The evidence, which was more than sufficient to support conviction of defendant of each of the substantive offenses, will be discussed in greater detail below in addressing his specific contentions. Although disputing details regarding the manner in which the arson was committed, defendant did not and does not deny the commission of rape, arson, and murder. He denies any intent to kill the attempted murder victims, however.

Defendant surrendered to authorities and confessed shortly after the offenses occurred. He claimed that his purpose in committing the arson was to drive the family out of the home so that he could kill David Gawronski, shooting him with a shotgun, as Ava watched. His avowed purpose was to cause her to suffer the same emotional pain that he claimed to have suffered when she abruptly discontinued counseling that she had been giving him. The People sought to prove that, at the time defendant actually ignited the gasoline vapor in the Gawronski home, his intent was to kill the entire Gawronski family.

Defendant was represented by appointed counsel throughout the guilt and special circumstance phases of the trial and the first penalty trial. When the jury was unable to reach a penalty verdict and was discharged, however, he elected to represent himself in future proceedings, accepting the assistance of his former attorneys as standby counsel.[2]

Between the two penalty trials, defendant wrote letters to Ava Gawronski and others in which he threatened that if he were allowed to live he would continue to cause Ava to suffer by harming her relatives. He testified that his purpose was not to upset the recipients, but to provoke the prosecutor, whose competence he had belittled in the letters, into seeking the second penalty trial because he felt that final determination of the penalty by a jury was "appropriate."

Defendant presented substantially the same mitigating evidence that had been presented at the first penalty trial. He chose, however, to withhold evidence heard by the first penalty jury which suggested that the quality of counseling and the manner in which it was terminated by Ms. Gawronski did not meet professional standards of competence and may have contributed to an emotional and mental turmoil that precipitated defendant's conduct. Instead, defendant stipulated that she had given him the highest

---

[2] Although they had been relieved before the second penalty trial, prior to imposition of judgment counsel were permitted to argue a motion for new trial addressed to the guilt phase.

possible quality of treatment, and urged the jury to consider only what he did and not whether any emotional or mental state may have affected his actions.

JURY SELECTION—SECOND PENALTY TRIAL

1. *Restriction on Voir Dire.*

■■■■ Defendant's claim that the trial court improperly restricted the scope of voir dire during the initial examination of prospective penalty phase jurors lacks merit.

After considering requests for hardship exemptions by the prospective jurors, the court conducted a sequestered voir dire of those remaining (see *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301]), limiting that initial examination to "death qualification"—i.e., to determination of whether any prospective juror had such conscientious or religious scruples about capital punishment that his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (*Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 589, 100 S.Ct. 2521]. See also *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 765 [251 Cal.Rptr. 83, 759 P.2d 1260].) In an effort to determine whether the evidence of serious burn injuries suffered by the victims would cause a jury to automatically vote for the death penalty, defendant sought to inquire about the prospective jurors' attitudes toward such injuries. The People objected and, at that stage of the examination,[3] the court ruled that the jury would not be told of the injuries suffered by Ava Gawronski, and defendant would not be permitted to ask the prospective jurors if knowledge of the extent of those injuries would affect their ability to perform their duties.

It is true that counsel must be permitted to ask questions of prospective jurors that might lead to challenges for cause. (*People* v. *Williams* (1981) 29 Cal.3d 392, 407 [174 Cal.Rptr. 317, 628 P.2d 869].) The inquiry that

---

[3] The prospective jurors had not been advised at that time that the great bodily injury allegation accompanying the attempted second degree murder conviction had been found true. Defendant was rearraigned and that finding included after the death qualifying voir dire had been completed.

Our examination of the general voir dire conducted after the death qualification of the prospective jurors reveals no attempt to restrict questioning on the jurors' attitudes about arson and burn injuries. In sum, neither the court's ruling nor the ensuing examination of the jurors affords a basis upon which to conclude that defendant's right to a fair and impartial jury was affected in any way by the court's ruling. (See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1086 [259 Cal.Rptr. 630, 774 P.2d 659].)

defendant sought to make was not relevant to the death qualification process, however. The *Witherspoon-Witt* (*Wainwright* v. *Witt, supra,* 469 U.S. 412; *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) voir dire seeks to determine only the views of the prospective jurors about capital punishment in the abstract, to determine if any, because of opposition to the death penalty, would "vote *against* the death penalty without regard to the evidence produced at trial." (*People* v. *Adcox* (1988) 47 Cal.3d 207, 250 [253 Cal.Rptr. 55, 763 P.2d 906]; *Wainwright* v. *Witt, supra,* 469 U.S. 412, 416 [83 L.Ed.2d 841, 853].) Such a juror may be excused because he or she would be unable to faithfully and impartially apply the law. The inquiry is directed to whether, without knowing the specifics of the case, the juror has an "open mind" on the penalty determination. There was no error in ruling that questions related to the jurors' attitudes toward evidence that was to be introduced in this trial could not be asked during the sequestered *Witherspoon-Witt* voir dire.[4]

■ The power of the judge to control the proceedings includes the exercise of discretion over the manner in which the voir dire will be conducted. (*People* v. *Keenan* (1988) 46 Cal.3d 478, 542-544 [250 Cal.Rptr. 550, 758 P.2d 1081].) ■ No abuse of that discretion occurred here. Defendant was not precluded from attempting to show in the subsequent general voir dire that a juror harbored any specific bias that would cause him to vote for the death penalty without regard to mitigating evidence, and thus should be excused for cause. Since defendant did not do so, and did not exhaust his peremptory challenges, he is precluded from arguing on appeal that the jury was not properly constituted. (*People* v. *Coleman, supra,* 46 Cal.3d 749, 770.)

### 2. *Death Qualification.*

We also reject, as we have in past cases, the suggestion that the death qualification process is impermissible because it results in a death-oriented jury. (See *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]; *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1212-1213 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 78-79 [241 Cal.Rptr. 594, 744 P.2d 1127].) We reject for the same reasons the argument that questions properly asked of prospective jurors during that process predispose those jurors who are selected to vote for imposition of the death penalty. Although some of the questions asked during voir dire in this case would not on their face elicit answers that would be the basis for a challenge for cause, they were clearly directed to uncovering attitudes that

---

[4] We noted in *People* v. *Fields* (1983) 35 Cal.3d 329, 358, footnote 13 [197 Cal.Rptr. 803, 673 P.2d 680], that excusing a juror for cause because he would vote against the death penalty based on evidence to be presented would violate *Witherspoon*.

would warrant further inquiry. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 187-190 [222 Cal.Rptr. 184, 711 P.2d 480].)

## GUILT PHASE ISSUES

Defendant asserts as error the failure of the court to give instructions on lesser offenses included within the attempted murder counts, and challenges the sufficiency of the evidence to support the verdict finding him guilty of the attempted murder of Sara Gawronski. These claims, which we conclude lack merit, will be discussed in another part of this opinion.

Defendant's principal challenges to the guilt phase proceedings are to the application of the explosives special circumstance and the court's refusal to give defendant's proffered instruction that before the arson special-circumstance allegation could be found true the jury must find that defendant had an independent felonious purpose for the arson, i.e., that the arson was not committed for the purpose of killing David Gawronski. (*People* v. *Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468].)

In affirming the judgment, we shall conclude that the delivery-of-explosives special circumstance does not apply to murders in which death is caused by a gasoline generated fire. We shall also conclude, however, that because defendant had concurrent purposes in starting the fires in the victims' home, the special circumstance of murder in the commission of arson was properly charged and found, and that defendant suffered no prejudice as a result of either the erroneous explosives special-circumstance finding or omission of the *"Green"* instruction.

## SPECIAL CIRCUMSTANCES

3. *Murder by Delivery of an Explosive.*

a. *The statute.*

Section 190.2, subdivision (a)(6) (hereafter subdivision (a)(6)) creates as a special circumstance that renders a person convicted of first degree murder eligible for the death penalty: "The murder was committed by means of a destructive device, bomb, or explosive that the defendant mailed or delivered, attempted to mail or deliver, or cause to be mailed or delivered and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings."

■ Defendant contends that gasoline is not an explosive within the meaning of this subdivision, but, if it is, the subdivision applies only if a

defendant intends to use gasoline as an explosive. The People concede that gasoline is not an explosive, but argue that defendant did "deliver" gasoline vapor which, the People also argue, is an explosive within the meaning of subdivision (a)(6).

The evidence, however, refutes the suggestion that gasoline vapor is an explosive as defined in the relevant statutes and contemplated by subdivision (a)(6). Neither the statutory history nor the statutory scheme in which subdivision (a)(6) and its companion, subdivision (a)(4) of section 190.2 (hereafter subdivision (a)(4))[5] operate supports the construction urged by the People. And, even were we to assume arguendo that gasoline vapor is an explosive under the statutory definition, defendant did not "deliver" or mail explosive gasoline vapor.

b. *The evidence relevant to application of subdivision (a)(6).*

(i) The fire and explosion.

Defendant carried gasoline in two 5-gallon, plastic buckets to the Gawronski home. He threw one bucket through the window of the bedroom occupied by David and Ava Gawronski, where it landed on the bed and overturned. The other bucket was either carried into the home and the gasoline distributed in the hallway, kitchen, and dining area (as the People theorized), or that bucket was thrown through a sliding glass door from the patio into the dining area, where it landed upright under the table (as defendant testified). The vapor rising from the gasoline mixed with the air in these rooms and the mixture was ignited by lighted highway flares that defendant threw in after the gasoline. The vapor-air combination in the rooms expanded instantaneously as it was heated by the "flash burn." In the bedroom, where the vapor was confined, the expanding gases created an overpressure effect or explosion that blew out the window. The flash burn caused the burn injuries that led to the death of David Gawronski. It is undisputed, therefore, that defendant caused a lethal "explosion."

(ii) Gasoline as an "explosive."

The expert witnesses agreed, however, that explosions are not all caused by "explosives" as that term is understood in the scientific community and used in the relevant statutes.

---

[5] Subdivision (a)(4): "The murder was committed by means of a destructive device, bomb, or explosive planted, hidden or concealed in any place, area, dwelling, building or structure, and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings."

Not every substance or object that is capable of exploding is an "explosive."[6] The expert testimony in this case established that neither gasoline nor gasoline vapor is an explosive.

The People's arson experts testified that gasoline does not burn below a temperature of 495° Fahrenheit. It vaporizes at −45°, however, and the vapor will burn when it is within the flammable range of 1.4 to 7.6 percent of the air. When the combination of air and vapor ignites, a relatively instantaneous "flash burn occurs," a sudden oxidation or burning of the flammable gasoline vapor. That flash burn stops as soon as the flammable mixture is consumed, and does not cause any further fire unless other combustible material is ignited during this process.

A flash burn does, however, rapidly heat the ambient air. The heated air expands, and that expansion of existing gases causes a sudden increase in air pressure. This increased pressure normally dissipates into the surrounding air space, but if the heated and expanding air is confined in a container, the pressure continues to increase. If that pressure exceeds the structural strength of the container, the resulting "overpressure" will cause the container to explode. Whether a flash burn, such as that occurring when a combination of gasoline vapor and air is ignited, will cause this type of explosion depends primarily on (1) the amount of flammable vapor-air mixture present at the moment of ignition, and (2) the size of the container. One expert explained: "The quantity of the fuel-air mixture [necessary to cause an explosion] is directly related to the cubic feet of the container." If the quantity of flammable mixture is too small or the container is too large, the resulting pressure will be insufficient to cause the container to explode.

Moreover, the effect of an explosion caused by the overpressure effect of a flash burn differs greatly from that of an explosion caused by what were described by the experts as "true" or "high" explosives. The source of a "concentrated" explosion, one caused by a true explosive, is typically a

---

[6] This self-evident proposition was illustrated by one expert witness who offered as an example the explosion of an unopened can of beans heated on a stove. Other exploding substances or objects that are not deemed "explosives" have received judicial attention in *Gordon v. Aztec Brewing Co.* (1949) 33 Cal.2d 514 [203 P.2d 522] (beer); *Zentz v. Coca Cola Bottling Co.* (1952) 39 Cal.2d 436 [247 P.2d 344] (Coca-Cola); *Myers v. Industrial Acc. Comm.* (1923) 191 Cal. 673 [218 P. 11] (sherry); *Saporito v. Purex Corp., Ltd.* (1953) 40 Cal.2d 608 [255 P.2d 7] (bleach); *Park v. Standard Chem Way Co.* (1976) 60 Cal.App.3d 47 [131 Cal.Rptr. 338] (cleanser); *Wollen v. Aerojet General Corp.* (1962) 57 Cal.2d 407 [20 Cal.Rptr. 12, 369 P.2d 708] (paint); *Millers' Nat. Ins. Co., Chicago, Ill. v. Wichita Flour M. Co.* (10th Cir. 1958) 257 F.2d 93 [76 A.L.R.2d 385] (dust); *Dalehite v. United States* (1953) 346 U.S. 15 [97 L.Ed. 1427, 73 S.Ct. 956] (fertilizer); *Kotiadis v. Gristede Bros., Inc.* (1964) 20 A.D.2d 689 [246 N.Y.S.2d 662] (grapefruit sections); *Shields v. County of San Diego* (1984) 155 Cal.App.3d 103 [202 Cal.Rptr. 30] (tuna waste); *Van Zee v. Bayview Hardware Store* (1968) 268 Cal.App.2d 351 [74 Cal.Rptr. 21] (aerosol can).

small quantity of an explosive solid material such as a stick of dynamite. A concentrated explosion is self-contained—independent of ambient conditions, and not dependent on a supply of oxygen. When detonated the explosive material undergoes a chemical reaction that abruptly generates a large quantity of gas, mainly nitrogen, that was not present before the detonation. The volume of gas rapidly becomes thousands of times larger than that of the original solid, and the resulting shock wave creates a compressive force of approximately 25,000 pounds per square inch.

By contrast, an explosion caused by a flash burn of gasoline vapor and air is "diffuse." Its source is not a single piece of explosive solid material, but the entire flammable mixture of gases in the air. Such an explosion is entirely dependent on the ambient conditions. If any is lacking, e.g., insufficient time for the gasoline to vaporize or for the vapor to mix with the air, a vapor-air mixture that is too rich or too lean, or a container that is too large at the time of ignition, there will be no flash burn or, if one occurs, no overpressure and no explosion.

c. *Construction of subdivision (a)(6).*

Notwithstanding this evidence, the People contend that by causing the flash burn and diffuse gasoline vapor-air explosion that caused the death of David Gawronski, defendant delivered an "explosive" within the meaning of subdivision (a)(6).

The People argue, and we agree, that Health and Safety Code section 12000[7] defines "explosive" for purposes of subdivision (a)(6), as it does for

---

[7] Section 12000 of the Health and Safety Code both broadly defines "explosives" and specifies particular substances that fall within its definition. In 1982, the section provided: "[T]he term 'explosives' shall mean any substance, or combination of substances, the primary or common purpose of which is detonation or rapid combustion and which is capable of a relatively instantaneous or rapid release of gas and heat, or any substance, the primary purpose of which, when combined with others, is to form a substance capable of a relatively instantaneous or rapid release of gas and heat. The term 'explosives' shall include, but shall not necessarily be limited to, any of the following:

"(a) Dynamite, nitroglycerine, picric acid, lead azide, fulminate of mercury, black powder, smokeless powder, propellant explosives, detonating primers, blasting caps, or commercial boosters.

"(b) Substances determined to be class A and class B explosives as classified by the United States Department of Transportation.

"(c) Nitro carbo nitrate substances (blasting agent) as classified by the United States Department of Transportation.

"(d) Any material designated as an explosive by the State Fire Marshal. . . .

"(e) Certain class C explosives as designated by the United States Department of Transportation when listed in regulations adopted by the State Fire Marshal.

"For the purpose of this part, the term 'explosives' shall not include any destructive device, as defined in Section 12301 of the Penal Code, nor shall it include ammunition or small arms primers manufactured for use in shotguns, rifles, and pistols."

the first degree murder category of murder by explosives. (§ 189.) We do not agree, however, that a gasoline vapor is an explosive under that definition.

In the absence of any definition specific to section 190.2 and its predecessor, of necessity Health and Safety Code section 12000 must supply the meaning of the term "explosive" as used in subdivisions (a)(4) and (a)(6). The term "explosive" had been used in the former section 190.2, subdivision (b), enacted in 1977.[8] At that time the definition of explosive contained in Health and Safety Code section 12000, had already been incorporated into section 189 which defined, inter alia, first degree murder by explosive.[9]

We presume that the Legislature, and later the electorate, were aware that section 189 incorporated the Health and Safety Code definition of "explosive" and were cognizant of the statutory framework within which the explosives special circumstance was to operate when former section 190.2 and the current subdivisions (a)(4) and (a)(6) were adopted. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1012 [239 Cal.Rptr. 656, 741 P.2d 154]; *People* v. *Weidert* (1985) 39 Cal.3d 836, 844 [218 Cal.Rptr. 57, 705 P.2d 380]; *Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394]; *In re Phyle* (1947) 30 Cal.2d 838, 845 [186 P.2d 134].) No reason appears in the history, language, or context of these special circumstances for believing that the term "explosive" means anything different in section 189, and nothing in the history of either statute suggests that the electorate intended a different meaning when former section 190.2 was enacted, or any change when the present section 190.2 was adopted.

The only reference to the explosives special circumstance in the 1978 election materials was the statement of the Legislative Analyst that: "The proposition would . . . expand and modify the list of special circumstances which require either the death penalty or life without the possibility of parole. As revised by the measure, the list of special circumstances would, generally speaking, include the following: . . . (2) murder involving

---

[8] Former section 190.2, subdivision (b), enacted by the Legislature in 1977, defined as a special circumstance a willful, deliberate, and premeditated murder "perpetrated by means of a destructive device or explosive." (See Stats. 1977, ch. 316, § 9, p. 1257.)

[9] Use of explosives to commit a murder was added as a category of first degree murder long after murder by arson was so categorized. Section 189 has provided since its adoption in 1862 that murder in the perpetration of arson is murder of the first degree. In 1969 murder perpetrated by a "bomb" was added to the categories of murder that are of the first degree. In 1970 "bomb" was replaced by the present language "murder which is perpetrated by means of a destructive device or explosive," and a definitional reference added: "As used in this section, 'destructive device' shall mean any destructive device as defined in Section 12301, and 'explosive' shall mean any explosive as defined in Section 12000 of the Health and Safety Code."

concealed explosives or explosives that are mailed or delivered; . . . ." (Ballot Pamp., Gen. Elec. (Nov. 7, 1978) p. 32.)

The ballot argument thus recognized that subdivision (a)(4) was to apply only to murder by means of concealed explosives, and that subdivision (a)(6) was to apply to deaths caused by mailing or delivering explosives. It is clear from this history that subdivisions (a)(4) and (a)(6) were intended to do no more than modify and/or expand the special circumstance category of murder by explosives, not change the nature of the substances that had been considered "explosives" in section 189 and former section 190.2.

Health and Safety Code section 12000 therefore provides the definition of explosive for purposes of subdivisions (a)(4) and (a)(6), just as it did for former section 190.2, and continues to do for purposes of section 189.

No prior case, however, has considered whether a substance other than a "true" explosive, one that does not cause a concentrated explosion by converting a solid into gases, but is capable of causing a diffuse vapor explosion, is an explosive within the meaning of either section 189, or subdivisions (a)(4) and (a)(6).

The People argue that defendant's use of the combination of gasoline vapor and air within the confines of the victims' bedroom meets the criteria of Health and Safety Code section 12000 and is therefore use of an explosive. They rely in part on the provision in Health and Safety Code section 12000 that broadly defines an explosive as a substance or combination of substances "the primary or common purpose of which is detonation or rapid combustion and which is capable of a relatively instantaneous or rapid release of gas and heat. . . ."[10]

The People concede, however, that gasoline is intended principally for use as motor fuel; is not in and of itself an "explosive"; and, when uncontained, is designed to burn rather than explode. They argue, nonetheless, that the expert testimony establishes that gasoline, as used by defendant,

---

[10]The People have also suggested that gasoline is an explosive within the definition of Health and Safety Code section 12000 by virtue of the statutory incorporation by reference of schedules adopted by the administrative agencies named therein. Thus, it may be an explosive under the United States Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms' List of Explosives Materials, which includes any liquid that may explode. (51 Fed.Reg. 46979-46980 (Dec. 29, 1986).)

We recognize that by incorporating by reference certain state and federal schedules on which gasoline is listed as an explosive, rather than its more common designation as a flammable liquid, Health and Safety Code section 12000 may at times literally characterize gasoline as an explosive for other purposes. The People no longer contend that gasoline is an explosive for purposes of subdivision (a)(6), however.

meets the statutory definition of an explosive: As the gasoline vaporizes, the vapor mixes with air. When ignited in the proper proportion the combination of gasoline vapor and air is capable of producing heat rapidly, and gas is also produced in the form of carbon monoxide and carbon dioxide. This, the People contend, meets the literal definition of an explosive established in Health and Safety Code section 12000 as a substance "capable of a relatively instantaneous or rapid release of gas and heat." The expert testimony refutes that claim.

The expert testimony establishes instead that while carbon monoxide and carbon dioxide are *by-products* of a gasoline vapor initiated flash burn and explosion, gas is not produced or generated in that process. "Release" of a gas from a substance contemplates that a gas will be generated from that substance, not simply that one type of gas will be transformed into another type of gas. Thus, gas is not "released" during the flash burn as required by the Health and Safety Code section 12000 definition.

This distinction between the generation of gas from another substance and the gases which are by-products of a flash burn distinguishes true explosives. True explosives cause concentrated explosions in which the concussive force is generated by the transformation of the solid into a rapidly expanding gas. The ignition of gasoline vapor may cause a diffuse explosion, like that which occurred here, when existing gases present in the air expand on ignition causing an overpressure effect. The carbon monoxide and carbon dioxide by-products that remain after a diffuse explosion are not the cause of the pressure or explosion.

The People's further argument that, as used by defendant, gasoline can be an explosive as defined in Health and Safety Code section 12000, also fails. The statute specifies that an explosive is a "substance or combination of substances, . . ." Gasoline may be a substance, but, as the People have now conceded, it is not an explosive. It does not become such based on the manner in which it is used. Under the statutory definition of explosive, the nature of the substance, not the manner in which a substance is used, is determinative.[11] Therefore, even were we persuaded that in this context the

---

[11] The Legislature has, in subdivisions (a)(4) and (a)(6), and in other specific statutes, provided for the use of *confined* gasoline. Section 12301, subdivision (a)(5), includes within its definition of a "destructive device" the following: "Any breakable container which contains a flammable liquid with a flashpoint of 150 degrees Fahrenheit or less and has a wick or similar device capable of being ignited, other than a device which is commercially manufactured primarily for the purpose of illumination." Subdivisions (a)(4) and (a)(6) in turn designate murder by means of a destructive device among the types of murder to which those special circumstances apply.

Health and Safety Code section 12000 provides at the same time that "[f]or the purposes of this part, 'explosives' does not include any destructive device, as defined in Section 12301." And, it is noteworthy that while Health and Safety Code section 12000 specifically identifies

electorate intended something other than the common meaning of "deliver"—"to take and hand over to or leave for another" which we address below, it is clear that the defendant did not deliver an "explosive."

The People also fail to propose a theory under which defendant's use of gasoline vapor could be deemed to meet the further requirement of subdivision (a)(6) of section 190.2 that murder be committed by means of an explosive "that the defendant mailed or delivered, attempted to mail or deliver, or cause[d] to be mailed or delivered, . . ." Assuming arguendo that throwing a substance through a window or door constitutes "delivery" within the meaning of subdivision (a)(6), the substance that defendant threw was not, as we have shown, an explosive. It was gasoline. The gasoline vapor was not "delivered." It arose by an independent physical process after the gasoline was thrown into the home. And the vapor alone was not explosive until it combined with air in the required proportion. Manifestly, defendant did not deliver the air that was already present in the victims' home. Thus, even if gasoline vapor were an explosive, or the manner in which gasoline is used were a basis for considering it an explosive, defendant could not be found to have killed by means of *delivery* of an explosive, and thus his conduct was not conduct described in subdivision (a)(6).

As we have explained, therefore, in using gasoline in his attempt to start a fire in the Gawronski home defendant did not commit murder by means of an "explosive" as that term is defined in Health and Safety Code section 12000, or used in subdivision (a)(6). Moreover, acceptance of the People's argument would make subdivision (a)(6) applicable whenever gasoline is used as an accelerant in an arson because an "explosion" accompanies any ignition of gasoline vapor, and would lead to arbitrary and absurd results. Any death in an arson fire started with gasoline would be murder by means of an explosive regardless of whether death was caused by a flash burn, an explosion or by an ensuing fire, but murderers who ignited lethal fires using papers or wood shavings would be deemed less culpable than those who started a fire of equal intensity with gasoline. In construing a statute we must avoid such arbitrary, unjust, and absurd results whenever the language of the statute is susceptible of a more reasonable meaning. (*People* v. *Daniels* (1969) 71 Cal.2d 1119, 1130 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].)

Finally, subdivision (a)(17)(viii) of section 190.2 creates a special circumstance of murder in the commission or attempted commission of arson. A

---

numerous substances that are much less commonly available than gasoline as explosives (picric acid, lead azide, fulminate of mercury, and nitro carbo nitrate substances), it does not mention gasoline. Surely, had it been the intent of the Legislature that gasoline be considered an explosive under the statutory definition, it too would have been listed as an explosive, as are dynamite and nitroglycerine.

construction of subdivision (a)(6) to encompass what is essentially a murder in the commission of arson would result in overlapping special circumstances. ■ "[T]he court should construe special circumstance provisions to minimize those cases in which multiple circumstances will apply to the same conduct, thereby reducing the risk that multiple findings on special circumstances will prejudice the defendant." (*People* v. *Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]. See also, *People* v. *Montiel* (1985) 39 Cal.3d 910, 927 [218 Cal.Rptr. 572, 705 P.2d 1248].)[12]

### 4. *Murder in the Commission of Arson.*

#### a. *The statute.*

■ The arson special circumstance of section 190.2 provides: "The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies: . . . [¶] (viii) Arson in violation of Section 447."[13] (§ 190.2, subd. (a)(17)(viii) [hereafter subdivision (a)(17)(viii)].)

Section 190.2, subdivision (a)(17) identifies eight felonies in addition to arson as predicates for the "felony murder" special circumstance: robbery (§ 211), kidnapping (§§ 207 and 209), rape (§ 261), sodomy (§ 286), lewd and lascivious conduct on a child under 14 years of age (§ 288), oral copulation (§ 288a), and first or second degree burglary (§ 460).

■ Defendant, relying on *People* v. *Green, supra,* 27 Cal.3d 1, contends that the trial court erred in refusing to instruct the jury that the arson

---

[12]Our conclusion that defendant did not commit murder by means of an explosive as that term is used in subdivision (a)(6) makes it unnecessary to address appellant's claim that the trial court erroneously admitted demonstrative evidence of the manner in which gasoline vapor "explodes" when enriched with oxygen and ignited within a steel tube, evidence that was relevant only to establishing the truth of this special circumstance allegation.

[13]No section 447 existed in 1978. As enacted in 1872, section 447 had defined arson as the "wilful and malicious burning of a building, with the intent to destroy it." Section 447 was repealed in 1929. (Stats. 1929, ch. 26, § 6, p. 47.) In 1978, section 451 provided, inter alia: "A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or aids, counsels or procures the burning of, any structure, forest land or property. . . . [¶] (b) Arson that causes an inhabited structure or inhabited property to burn is a felony punishable by imprisonment . . . ."

In *People* v. *Oliver* (1985) 168 Cal.App.3d 920, 926 [214 Cal.Rptr. 587], the Court of Appeal held that this subdivision was a restatement of former section 447, and thus the reference to section 447 in subdivision (a)(17)(viii) should be read as a reference to subdivision (b) of section 451 pursuant to the command of Government Code section 9604.

The arson special circumstance thus applies only to arson of an inhabited structure or inhabited property.

special circumstance is applicable only when the defendant has an independent felonious purpose for the commission of arson.[14] Defendant argues that omission was prejudicial because there was the evidence that his purpose in committing arson was either to kill the Gawronski family or to facilitate the killing of David Gawronski.

The trial court refused the instruction. The People argue that no *Green* instruction was required, and that the evidence supports the ruling and the verdict, because defendant had an independent intent to commit arson: By his own admission, his objective in committing the arson was not to kill David Gawronski, but to drive him and his wife out of the house. The murder was to follow and was to be independent of the arson. The arson was not simply incidental to, or committed to facilitate, the murder.

b. *The evidence relevant to defendant's purpose.*

David Gawronski awakened Ava early on January 6, 1982, screaming that the house was on fire. There was no fire in their bedroom at that time. When Ava tried to leave the room she was driven back by intense heat in the dining room. Based on this testimony, other evidence of the manner in which the separate fires in the home spread, and defendant's admission that he knew that David and Ava Gawronski were in their bedroom when he ignited the gasoline vapor and that their daughter was an infant who could not care for herself, the People argued that defendant's purpose in setting the fires was to kill all three members of the Gawronski household.

Defendant testified, however, that his purpose in setting the fires was to drive the Gawronskis out of the house. Evidence of his extrajudicial statements made both before and after the crimes was consistent in expressing his intent when he went to the Gawronski home to set fires in the house for the purpose of driving the family outside. He planned to shoot David Gawronski as he fled from the front door as Ava Gawronski watched. To do so he would set one fire in the dining room to prevent the family from using the patio door as an exit. To drive the family members out of the front

---

[14] The jury was instructed: "To find that the special circumstance, referred to in these instructions as murder in the commission of arson is true, it must be proved: [¶] That the murder was committed while the defendant was engaged in the commission or attempted commission of an arson."

The defendant had requested that the following paragraph, based on that standard instruction (CALJIC No. 8.81.17), also be given: "To find the special circumstance . . . true, it must be proved that the murder was committed in order to carry out or advance the commission of the crime of arson or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the arson was merely incidental to the commission of murder."

door another fire was to be set at the back of the house. Defendant assumed the master bedroom was in the front of the house.

The plan was carried out methodically. One bucket of gasoline was left near a window at the rear of the house that defendant thought might be a bedroom, although he was not sure. Another bucket of gasoline was left on the patio with an unlit flare and a shotgun. Then defendant returned to the rear of the house where he threw the bucket of gasoline through the window, followed by the flare. Defendant threw the flare even though he had heard screams from David and Ava Gawronski and knew they might be in the room. After this he went to the patio where he threw the second bucket of gasoline through the sliding door or adjacent window.

Defendant then picked up the shotgun, placed it in the trunk of a car he had rented, and left the scene. The shotgun and ammunition for it were found in the car during a search conducted two days after the fire.

Although defendant knew, when he heard the Gawronskis' screams, that he could not carry out the plan "specifically," he intended "to carry out whatever other steps [he] had already preplanned."

c. *Application of subdivision (a)(17)(viii).*

In *People* v. *Green, supra,* 27 Cal.3d 1, a case in which the "felony murder" special circumstance of the 1977 death penalty law was construed, this court held that the special circumstance was inapplicable to cases in which the defendant intended to commit murder and only incidentally committed one of the specified felonies while doing so. We explained in *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279], however, that when the defendant has an independent purpose for the commission of the felony, and it is not simply incidental to the intended murder, *Green* is inapplicable.

Setting a fire to drive the occupants out of a home would establish an independent purpose since the fire is not intended to kill. Thus, if defendant's testimony and statements are believed, the death of David Gawronski fell squarely within the purpose of the felony-murder-arson special circumstance. The victim died in an arson fire set by defendant for a purpose other than causing his death. As in *People* v. *Robertson, supra,* 33 Cal.3d 21, the underlying felony, here arson, was not simply incidental to the intended murder of David Gawronski, which was to be committed by another means independent of the arson. The relation between defendant's intent to murder David Gawronski, and his intent to burn the Gawronski home, would

not invoke the *Green* rule since defendant had independent, albeit concurrent, goals.[15]

There was also circumstantial evidence, however, to support a conclusion, and indeed the prosecutor argued and the jury apparently agreed, that when defendant actually set fire to the gasoline in the Gawronski home, regardless of the order in which the rooms were torched, defendant intended to kill the family members. The trial court erred, therefore, in refusing to give defendant's requested instruction based on *Green* that the arson special circumstance could not be found true unless defendant had a purpose for commission of the arson independent of causing the death of David Gawronski.

By any standard the error was harmless. We recognize that the jury verdicts finding defendant guilty of the attempted second degree murder of Ava Gawronski and Sara Gawronski confirm that the jury believed defendant ignited the gasoline vapor with the intent thereby to kill the family members in the ensuing fire. Nonetheless, defendant's own testimony, his extrajudicial statements made before and after the offense, and the shotgun and ammunition found in the trunk of his rental car after the offense, afford overwhelming evidence that when he commenced the arson his intent was to start a fire that would drive the family out of the home. At that time his purpose was not to kill David Gawronski. His belated realization that the Gawronski bedroom was occupied, and his resolution to proceed with his plan nonetheless, does not negate the evidence that he had a purpose independent of causing the death of David Gawronski in his commission of arson.

In light of that evidence, omission of the requested instruction was not prejudicial and the felony-murder-arson special-circumstance allegation was properly found true.

## PENALTY PHASE ISSUES

Defendant's numerous assertions of penalty phase error include claims of prejudicial error in granting him the right of self-representation; the voir dire of prospective jurors; admission of evidence; prosecutorial misconduct; instructions; ruling on his motion for reduction of sentence; disproportion-

[15] For this reason we also reject defendant's argument that the rule of *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] should be extended to the felony-murder-arson special circumstance in this case. (See *People* v. *Farmer* (1989) 47 Cal.3d 888, 915 [254 Cal.Rptr. 508, 765 P.2d 940]; *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1026 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People* v. *Burton* (1971) 6 Cal.3d 375, 387-388 [99 Cal.Rptr. 1, 491 P.2d 793].)

ality of the death sentence; and failure to properly instruct and sentence on the noncapital offenses. The resolution of some of these claims requires consideration of the evidence relevant to defendant's background and mental state. We therefore describe below in greater detail this evidence, including evidence presented at the first penalty trial.

Defendant was 42 years old at the time of these offenses. A summa cum laude graduate of Bradley University in January 1967, he had been in graduate school pursuing a master's degree in English literature when he married, left school, and became an insurance underwriter. Since childhood he had been a "closed" person who did not discuss his thoughts with family or friends, and he had few close friends. Although he had not been a disciplinary problem in childhood, two incidents during his undergraduate college career led to brief hospitalizations for psychiatric treatment.

The first incident occurred in 1966 when defendant twice shot at other drivers on a freeway in order to experience and report to a classmate the emotions of a person who kills. No one, to his knowledge, was injured. He reported his conduct to one of his professors who arranged for psychiatric treatment. The second incident occurred in 1967 when defendant burned an automobile. Assertedly, he did this because his therapist at the time objected to his dating another participant in group therapy sessions on "ethical" grounds. He was hospitalized briefly after the automobile arson, but left because he did not believe he was benefitting from hospitalization.

Defendant discontinued therapy when he married in 1968. He had by this time concluded that his psychiatrist's primary concern was not his well-being, but how his actions reflected on her professionally. Defendant committed no further illegal acts and received no counseling or psychotherapy until 1979, when he and his wife separated and subsequently divorced. At that time Ava Gawronski, a licensed social worker, and marriage and family counselor, counseled the couple about their marital problems. When defendant's wife sought counseling from another therapist, Ms. Gawronski continued to treat defendant, first with regard to the marriage, but later, when the marriage could not be saved, for his individual emotional difficulties. She became the first person with whom defendant felt able to be open about his thoughts, and he became extremely dependent upon her.

The record strongly suggests, and the People do not dispute, that the nature of defendant's relationship with his therapist, and his "borderline

personality," having obsessive-compulsive characteristics,[16] precipitated his homicidal conduct.

Defendant's counseling session with Ava Gawronski increased in frequency until he had thrice weekly appointments. The sessions assumed such importance to him that he even flew back to Los Angeles from out-of-town appointments to attend. He accepted a promotion that entailed a move to Atlanta, Georgia in 1980, but left almost immediately to return to Los Angeles to resume his therapy. In addition to the counseling sessions defendant made numerous telephone calls to his therapist, often on an "emergency" basis, to seek her advice. As his dependence on his therapist increased he also began to experience what she termed "rape fantasies," but which defendant described as an extremely strong desire to commit an act of rape with his ex-wife or with the therapist. Ms. Gawronski encouraged him to discuss these thoughts, assuring him that she would not reject him regardless of what he told her about his thoughts or behavior.[17] He was at that time "terrified" that she might end their relationship.

The focus of defendant's thoughts of rape gradually shifted to the therapist alone. She continued to encourage him to discuss his thoughts with her. In October 1981, defendant expressed an intent to actually commit the act of rape, stood, and started to cross the room toward Ms. Gawronski before responding to her remonstration and returning to his seat. She continued the session and elicited a promise from him that in the future he would call her to warn her if he felt that he might act out again. In a telephone conversation later that evening, however, she expressed concern that continuing the therapy might not be in the best interests of herself or defendant, and said she would need time to think about what would be best. She spoke with defendant on the following day and indicated that continuing the professional relationship would not be in their interest.

Defendant subsequently received two letters from Ms. Gawronski. The first stated rather abruptly that she was terminating the relationship. The

---

[16] Prior to trial defendant had been examined by both a psychiatrist and a psychologist. Neither believed that he was either insane or suffered from any mental disorder.

The two aspects of his personality that emerge most clearly from defendant's own testimony and that of these experts are an insistence on precise, literally accurate description of events and emotions, and an expectation that a person with whom he feels close will live up to a commitment. If a commitment is not kept, it was important to him that the person who has failed him be made to understand the impact of that failure on defendant.

Manifestations of these characteristics are found in defendant's precise and detailed description of the manner in which the arson was committed, including his preoffense preparations, and in the reasoning and emotions by which he sought to justify or rationalize his homicidal conduct.

[17] Defendant kept a diary in which he recorded thoughts or ideas that he wanted to discuss with his therapist. The diary was admitted into evidence.

second explained in more detail the reasons for the decision, but nonetheless left defendant uncertain as to the reasons. Defendant made several attempts to contact Ms. Gawronski by telephone and in person to resolve his questions. When these efforts were unsuccessful he pursued her automobile and forced it to the side of a freeway, where he used an ice axe to break the glass in an attempt to pull her from the car to speak with her.[18] He left when other motorists stopped, and he realized that he had so terrified her that he would not be able to have a rational discussion with her.

Most significantly, in defendant's mind, Ms. Gawronski, the first person whom he had trusted absolutely, had broken her commitment that she would never reject him. He became obsessed with a need to show her how much she had hurt him, and decided to do so by causing her to suffer similar emotional pain.

Defendant rejected suicide, and ideas of killing several strangers whose severed heads he would mail to Ms. Gawronski with a note indicating that he had done so because she would no longer see him, and of killing the Gawronskis' infant daughter. He reasoned that these acts would not likely have the desired effect, and also decided that it would not be "appropriate" to kill an infant or strangers. In mid-December 1981, defendant concluded that he should kill Ms. Gawronski's husband before her eyes. In early January 1982, when Dr. Stein, from whom defendant was then receiving psychotherapy,[19] told defendant that Ms. Gawronski would not talk with defendant, he decided to proceed with his plan to kill David Gawronski. At that time he had been charged with an attempted rape of Ms. Gawronski, with the ice axe attack, and with the rape of his former wife.

Defendant initially planned to carry out the murder on January 4, 1982, and on the evening of January 3 made an audiotape explaining his feelings and accepting responsibility for what he was about to do. In this statement, defendant referred to Dr. Stein's opinion that Ms. Gawronski was not a competent therapist, and seemingly accepted his view that her incompetence and the manner in which she terminated the relationship had contributed to his distraught emotional state.[20]

---

[18] The ice axe was a piece of equipment defendant used for hiking and mountain climbing.

[19] A family counselor, from whom defendant sought counseling after Ms. Gawronski, had terminated her therapy when she concluded that she was not competent to treat him and had recommended that he seek psychiatric care.

[20] In the taped statement, defendant said that he had become excessively dependent upon Ms. Gawronski during the three years he had been receiving counseling from her. He loved and trusted her more than he had anyone else during his life, and he did not think he could live without her. He also stated, however, that through his discussions with Dr. Stein he came to realize that the therapeutic relationship had become a personal one, that Ms. Gaw-

At the first penalty trial, evidence was admitted that tended to confirm Dr. Stein's view that Ms. Gawronski had not rendered fully competent professional services to defendant. Kaushal Sharma, M.D., a forensic psychiatrist in private practice and an assistant professor of clinical psychiatry at the University of Southern California School of Medicine, testified as a defense witness. He stated that in his opinion there had been "many major problems in the treatment process." He offered his opinion that under the acceptable treatment standard for social workers the patient should have been discouraged from talking about rape fantasies; the number of treatment sessions should have been decreased, rather than increased, in order to avoid intensifying the fantasies; that late evening appointments alone with the patient in a dimly lit office would not be considered appropriate; and that the preferred treatment would be to decrease the patient's obsession and to dilute the relationship by making the patient less dependent on the therapist.

Dr. Sharma testified also that the manner in which the therapy had been abruptly terminated for a very dependent patient was a "major problem," and that the two letters to defendant from Ms. Gawronski gave a double message. Dr. Sharma believed that defendant's mental impairment and psychological disturbance were major contributing factors to his actions. He testified, however, that while defendant was distraught he had not been legally insane, and did not suffer from diminished capacity at the time of the charged offenses.

---

ronski realized this, and that she discontinued the therapy when she concluded that she could not handle it. Defendant believed when the tape was made that Ms. Gawronski had fostered his dependence and had participated in it.

Defendant repeatedly referred to Ms. Gawronski's assurances that she would not reject him, assurances given only the day before she told him, without explanation other than saying that he "was out of control," that she would not see him again. He seemingly accepted Dr. Stein's belief that Ms. Gawronski's treatment was not competent, and that her incompetence was reflected in the manner in which she terminated the therapy, leaving defendant to believe that he was at fault. Defendant also expressed frustration that Ms. Gawronski was complacent in her life-style, in the satisfaction she received from counseling other "non-threatening" clients, and in her belief that she was a competent therapist, when her therapy had destroyed him.

At the end of the tape defendant said he could not "stand to think of her going along complacently feeling so damned self-satisfied about everything, you know. I can't take that. I'm going to do what I have to and see that it doesn't happen, and I'm willing to pay the penalty for doing that." He also expressed his love for Ms. Gawronski, and indicated that he did not want to hurt her, only those around her, and that he accepted responsibility for what he was going to do. He nonetheless blamed her, saying: "However, on a personal level, and a moral level, and ethical level, I think Ava must realize that much of this would not have happened had she conducted herself in a professional manner."

A dozen witnesses were called by defendant at the first penalty trial. They included persons with whom he had worked and with whom he had developed social relationships, members of a track club with whom he ran, a child for whom he had been a "Big Brother," his father, and defendant himself.[21]

At the outset of the second penalty trial, defendant requested leave to represent himself, explaining that he had observed the legal process closely over the past two and one-half years, felt he could do a reasonable job defending himself, and wished to exercise his right to do so. The court described in detail the dangers of self-representation, and defendant expressed his understanding of the difficulties he would face. The court then noted defendant's education, stated that he had demonstrated that he was articulate and in total command of the English language, and found that defendant was mentally competent to represent himself and to make a voluntary and intelligent waiver of counsel. The court did so after rejecting the prosecutor's request for consideration of letters written by defendant after the first penalty trial threatening harm to relatives of Ms. Gawronski. The court concluded that the letters were irrelevant to defendant's competence to represent himself, and refused to consider them as evidence that defendant might not comport himself properly if granted the right of self-representation.

At the second penalty trial defendant did not call Dr. Sharma. Instead, he proffered a stipulation that Ms. Gawronski had provided the highest quality of care.[22] He again testified, and while he did not call all of the witnesses who had testified at the first trial, several were called and testimony similar to that given earlier was elicited.

The People's evidence in aggravation included graphic descriptions by the physician who had attended the burn victims of the extent of their injuries, the death of David Gawronski, the excruciating physical and emo-

---

[21] Defendant was described as an excellent professional in his work, helpful to those with whom he had run, and caring and solicitous of those with whom he had gone hiking and mountain climbing.

[22] Defendant stipulated that if called Ms. Gawronski would testify that: (1) she had provided him with the "highest possible quality of counseling"; (2) her decisions regarding the method of treatment were based on her professional opinion of what would be most beneficial for him; (3) it was never her intent that defendant attempt to act out his rape fantasies and she did nothing to indicate this would be acceptable; (4) the attempted rape was a complete surprise to her; (5) her decision to terminate therapy was made not only because she feared for her safety but largely because she did not feel further therapy would benefit defendant; and (6) she had not intentionally said or done anything intended to cause defendant to harm her or her family.

tional suffering of Ava Gawronski, the extent of rehabilitation necessary to enable her to live independently, and the permanent disfiguring and disabling aftermath of her injuries. Defendant's pre- and postoffense taped statements[23] were played to the jury, his threatening letters were read,[24] and experts who had examined him after the offense testified regarding his statements about the offenses and his statement that he would like to kill other persons whom he disliked.

Evidence of the manner in which the offenses were committed was also offered, including evidence of defendant's preplanning. As noted earlier, defendant claimed that his purpose in setting the two fires in the Gawronski home was to drive the couple outside where he would be waiting with a shotgun and would kill David Gawronski as his wife watched, but the People's evidence suggested that when the fires were ignited defendant intended to kill all of the occupants of the home. The evidence, which defendant did not dispute, established that before defendant threw the lighted flare into the room in which David and Ava Gawronski had been sleeping, but after he had thrown the bucket of gasoline through the window, he heard their screams and was aware that they were in the room when he ignited the gasoline vapor. Defendant testified that he felt he had to go through with his plan.

---

[23] Defendant testified that at the time of trial he no longer believed that Ms. Gawronski had been incompetent.

[24] The letter to Ms. Gawronski asserted that the prosecutor "could not get a death verdict if he tried Heinrich Himmler in Tel Aviv," and assured Ms. Gawronski that she had nothing to fear from him as he wanted her to live a long time to think about what happened every time she looked into a mirror, or could no longer do something. He promised that he would not seek to harm her brother "as much as his death would please me . . . . However, you do have other family members and friends . . . whom I have not promised not to harm. . . . When I get to prison, I will have all of the time in the world to do whatever is necessary. To initiate appropriate action against any of these people by someone on the outside. . . ."

Defendant's letter to Ms. Gawronski's father opined that the prosecutor was "almost as inept as a prosecutor as your daughter was as a therapist," reassured him that his daughter had nothing to fear from him, and declared that far from wanting to harm her he wanted her to live a long time so that she could reflect on what he and she had done. "Perhaps in the future she will not be so quick to make promises which she does not intend to keep.

"Perhaps this sordid affair may be summarized as follows: [¶] Little girls ought not to make promises which they do not intend to keep. When they do, they are playing with fire and they are apt to burn their fingers.

"In Ava's case, the figure of speech is particularly appropriate.

" . . . . . . . . . . . . . . . .

" . . . In any event, I got what I wanted out of all of this. With David dead and Ava in her present condition, I am satisfied."

At trial defendant testified that he had written the letters after his attorney had told him that the attitude of the recipients would be critical to a decision on retrying the penalty phase. Because he thought a jury should determine the penalty, he wrote the letters to provoke a retrial, and had not intended to threaten or frighten the recipients.

Evidence was presented through the testimony of Dr. John Hatcher, a psychologist affiliated with the University of California at San Francisco, who specialized in management and study of violent individuals. He had interviewed defendant at length, heard his taped confession, spoken with Ms. Gawronski, and interviewed defendant's former wife. Defendant told Dr. Hatcher that he felt morally justified in what he had done under his own ethical code, which was all he was responsible for, and that "[i]n the sense of revenge, I couldn't have asked for it to turn out any better than it did."

Dr. Hatcher believed that Ms. Gawronski's diagnosis of defendant as having a narcissistic personality was consistent with the information available at the time it was made, although his own diagnosis would be "borderline personality"—a person somewhere between neurotic and psychotic, who, when he is able to form a close personal relationship, tends to idealize the person and must devalue the ideal if that person is unable to live up to the image, by somehow showing the person he or she is not perfect.

Dr. Linda Weinberger, a psychologist employed by the County of Los Angeles and the University of California, had been appointed by the court to examine defendant at defense counsel's request. In response to her question whether he had thoughts of killing anyone, defendant told her that if he were not in jail he would like to kill two individuals—his former wife's employer, whom he believed had encouraged her to leave him, and the brother of Ms. Gawronski, whom defendant believed had encouraged Ms. Gawronski to stop seeing him. Defendant had stated that if sent to prison he would consider finding a prisoner who was about to be released to kill for him.[25]

### 5. *Self-representation.*

█ Defendant claims both that the trial court erred in permitting him to represent himself and that self-representation by a defendant during the penalty phase of a capital case is forbidden by section 686.1. We reject both arguments.

Defendant's first theory is that the letters he had written to Ms. Gawronski and her father were relevant to his competence to represent himself, and that these letters, his history of mental illness, and his self-destructive be-

---

[25] When advised by Dr. Weinberger that she might have to advise the potential victims of his threats, defendant was pleased that this might cause them discomfort. He testified, however, that at the time of the trial he had no intent to harm anyone, and then felt that a desire for revenge was an "unfulfilling attitude."

havior were all indicative that a reliable penalty determination would not be possible if he were permitted to represent himself.

The record does not support this claim, which rests in part on the faulty premise that self-representation may be denied at the penalty phase if necessary to ensure that mitigating evidence is presented.

The trial court's ruling that defendant was competent is fully supported by the record. None of the experts (who had already testified at the first trial) concluded that defendant was incompetent or mentally ill. He was well educated and of superior intelligence. He had testified at length at the guilt phase and presented his own request to be permitted to represent himself. The record refutes any suggestion that defendant elected to, or that the judge should have predicted that he intended to, represent himself as a means of state-aided suicide. There was no basis therefore for an inference that defendant might not have been competent to make an intelligent and voluntary decision.

Nor does hindsight support defendant's argument that he should not have been permitted to represent himself. He did present mitigating evidence. His decision to withhold evidence relevant to the quality of counseling he had received, and the possible effect on him of the manner in which that therapy was discontinued, was one that a defendant is entitled to make. To the extent that this defendant's peculiar mental state contributed to his decision, it was reflected in his need to have a jury, rather than legal and mental health professionals, determine the punishment that was appropriate to his conduct in light of the circumstances in which he acted. The record suggests that defendant may have hoped to be vindicated, at least partially, in his perception that his conduct was not entirely unreasonable in light of his personal moral/ethical standards. None of this refutes the evidence that defendant was competent.

We conclude, therefore, that the trial court did not err in ruling that defendant was competent to represent himself. We also conclude, as suggested in our recent decision in *People* v. *Bloom, supra,* 48 Cal.3d at pages 1222-1224, that the right to self-representation recognized in *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] is not limited to defense during the guilt phase of the trial, but extends to the penalty trial in a capital case. Notwithstanding the state's significant interest in a reliable penalty determination, a determination best made by a fully informed sentencer, a defendant's fundamental constitutional right to control his defense governs. (*People* v. *Bloom, supra,* 48 Cal.3d at pp. 1227-1228.) The defendant has the right to present no defense and to take the stand and both confess guilt and request imposition of the death penalty.

(See *People* v. *Guzman* (1988) 45 Cal.3d 915, 961-963 [248 Cal.Rptr. 467, 755 P.2d 917]; *People* v. *Grant* (1988) 45 Cal.3d 829, 849-850 [248 Cal.Rptr. 444, 755 P.2d 894]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 282 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v. *McKenzie* (1983) 34 Cal.3d 616, 628 [194 Cal.Rptr. 462, 668 P.2d 769]; *People* v. *Chadd* (1981) 28 Cal.3d 739, 750, fn. 7 [170 Cal.Rptr. 798, 621 P.2d 837] (per Mosk, J.); *People* v. *Teron* (1979) 23 Cal.3d 103, 108-115 [151 Cal.Rptr. 633, 588 P.2d 773].) It follows that the state's interest in ensuring a reliable penalty determination may not be urged as a basis for denying a capital defendant his fundamental right to control his defense by representing himself at all stages of the trial.[26]

■ Because we reject defendant's claim that permitting him to represent himself at the penalty trial was improper, he is foreclosed from complaining that his doing so resulted in the admission of evidence that may have been inadmissible, but to which he did not object. Failure to object waives any claim of error on appeal (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1089 [255 Cal.Rptr. 352, 767 P.2d 619]) and, having elected to represent himself, defendant may not now claim that he received ineffective representation at trial because the possibly objectionable evidence came in. (*People* v. *Bloom, supra,* 48 Cal.3d at p. 1226.)

### 6. *Psychotherapist-patient and Attorney-client Privileges.*

After an in camera hearing at the first penalty trial, the trial court ruled that an exception to the psychotherapist-patient privilege[27] permitted disclosure of defendant's threats to kill, or to have killed, Ms. Gawronski's brother and the employer of defendant's former wife. ■■■■ That ruling was reaffirmed and defendant's objection, that the attorney-client privilege[28] nonetheless applied, was overruled immediately before admission

---

[26] In so holding we necessarily reject defendant's argument that *Faretta* invalidates section 686.1, which mandates representation by counsel in all stages of a capital trial, only as to the guilt phase. Nothing in that decision implies such a limitation, and both the common law and constitutional history on which the United States Supreme Court relied support our conclusion that the right is absolute. (See *Faretta* v. *California, supra,* 422 U.S. 806, 821-834 [45 L.Ed.2d 562, 574-581].)

[27] This privilege, defined in Evidence Code section 1010 et seq., extends to "confidential communications" which are defined as "information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist in the course of that relationship and in confidence by a means which . . . discloses the information to no third persons other than those . . . to whom disclosure is reasonably necessary for the . . . accomplishment of the purpose for which the psychotherapist is consulted . . . ." (Evid. Code, § 1012.)

[28] The attorney-client privilege established by Evidence Code section 950 et seq. encompasses "confidential communication between client and lawyer" defined as "information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons. . . ." (Evid. Code, § 952.)

Because Dr. Weinberger was appointed to examine defendant at the request of his counsel, any statements he made to her for the purpose of obtaining a diagnosis for counsel's use in

of the testimony of Dr. Weinberger, to whom defendant had made those threats.

The court applied the psychotherapist-patient privilege exception of Evidence Code section 1024: "There is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." The judge did not explain the basis for overruling the attorney-client privilege claim, but did state that he was not ruling that defendant had waived either privilege.

a. *Psychotherapist-patient privilege.*

Defendant contends that the statements were confidential, and because they were made in a confidential relationship prior to the time Dr. Weinberger told him she might have to reveal them, he had not waived the confidential nature of the communication. We need not decide the waiver question to resolve this claim, however, because at the time of trial Dr. Weinberger had already revealed the communications that were, therefore, no longer confidential.[29]

Defendant's argument that the privilege was not abrogated by Evidence Code section 1024, because the section applies "only if the patient is presently dangerous and the therapist's testimony is necessary to prevent the danger," misses the point. ██ A psychotherapist has a professional duty to maintain the confidential character of communications made to him by his patient during the course of the relationship, but when it is necessary to disclose confidential information to avert danger to others the therapist must do so. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 441 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) ██ The purpose underlying Evidence Code section 1014 is not to prevent the use of a defendant's statements against him in legal proceedings. It exists to prevent the unnecessary disclosure of statements made in confidence in the course of a privileged communication with a therapist and thereby to facilitate treatment. (17 Cal.3d at pp. 440-442.) If the statements have been

preparing a defense were subject to both the psychotherapist-patient and attorney-client privileges, unless defendant waived those privileges or an exception permits disclosure. (See Evid. Code, § 1017, subd. (a); *Jones* v. *Superior Court* (1962) 58 Cal.2d 56, 60-61 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213].)

[29] Several months after her interview with defendant, Dr. Weinberger's uncertainty regarding defendant's intent continued. After consultation with her attorney, she arranged for the attorney to inform the potential victims of defendant's threats.

revealed to third persons in a communication that is not itself privileged, however, they are no longer confidential. (Cf. *Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 341 [107 Cal.Rptr. 309, 508 P.2d 309] [psychotherapist exchanged patient's records with other physicians after patient had actively asserted privilege; disclosure did not waive privilege].)

The question is not whether the psychotherapist-patient privilege has been waived or the exception that would permit compelled disclosure in a legal proceeding applies, but whether the privilege may be claimed at all once the communication is no longer confidential. Whether the psychotherapist "reasonably believes" (Evid. Code, § 1024) that revelation of the communication is necessary also becomes irrelevant once the communication has lost its confidential status. The reason for the privilege—protecting the patient's right to privacy and promoting the therapeutic relationship—and thus the privilege itself, disappear once the communication is no longer confidential.

b. *Attorney-client privilege/self-incrimination.*

■ The attorney-client privilege serves a different purpose, however. It exists to permit a client to freely and frankly reveal confidential information, including past criminal conduct, to the attorney or others whose purpose is to assist the attorney, and to thereby enable the attorney to adequately represent the client. (See *United States* v. *Zolin* (1989) 491 U.S. __, __ [105 L.Ed.2d 469, 484, 109 S.Ct. 2619].) In a criminal case the privilege also serves to preserve the defendant's privilege against self-incrimination that might otherwise be deemed to have been waived by his revelation of incriminating information.[30] To make adequate representation possible, therefore, these privileges assure criminal defendants that confidential statements to their attorney will not be admissible in any proceeding. These purposes were unaffected by Dr. Weinberger's revelation of defendant's statements to his potential victims.

The Legislature has recognized this distinction in purpose in Evidence Code section 1024, where it provides that there is no privilege under "this article," i.e., article 7, which contains only the psychotherapist-patient privilege, if the therapist believes it is necessary to disclose the communication. This section confirms that the purpose of the psychotherapist-patient privilege is not to preclude use of the defendant's statements in a legal proceeding, and reflects recognition that the purpose of promoting the therapeutic

---

[30] Defendant seeks to rely on his right against self-incrimination as an independent basis for exclusion of his statements. Since there was no state involvement or compulsion in eliciting his statements, no violation of his privilege against self-incrimination occurred. (*Colorado* v. *Connelly* (1986) 479 U.S. 157, 164 [93 L.Ed.2d 473, 482, 107 S.Ct. 515].)

relationship can no longer be achieved once the therapist has revealed the confidential communications to third parties. No similar provision reflects an intent that the attorney-client privilege terminate if a communication to an attorney is made public without a waiver of confidentiality by the client. ■■■ Since defendant's statements to Dr. Weinberger were also communications made in the attorney-client relationship (Evid. Code, § 952; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1060, fn. 11 [251 Cal.Rptr. 757, 761 P.2d 680]; *Torres* v. *Municipal Court* (1975) 50 Cal.App.3d 778, 784 [123 Cal.Rptr. 553]), unless defendant waived the privilege or did not intend that the statements be confidential they continued to be privileged notwithstanding the fact that they were no longer confidential at the time of trial.

The People argue that defendant did waive the privilege, or did manifest an intent that his statements be revealed to third parties, when Dr. Weinberger advised him that she might have to reveal his threats and he expressed satisfaction that this would cause the potential victims to worry. Since the statements were made before Dr. Weinberger advised defendant that she might reveal them, he did not waive the privilege by making them, and the trial court did not find a waiver in defendant's response to the warning. Since there was no clear intent to waive the privilege in that statement, we cannot conclude that the privilege was waived. The People argue alternatively that the privilege does not extend to threats of future criminal conduct.

No express exception to the attorney-client privilege exists for threats of future criminal conduct. Evidence Code section 956, however, provides that the privilege does not apply "if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud." That section was enacted in 1965 when the code itself was adopted. Similar exceptions were created in the code by Evidence Code section 981, which provides that the marital communication privilege does not exist "if the communication was made, in whole or in part, to enable or aid anyone to commit or plan to commit a crime or fraud," and in Evidence Code sections 997 and 1018, which provide that the physician-patient and psychotherapist privileges do not exist if the provider's services "were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a tort or to escape detection or apprehension after the commission of a crime or tort."

The comments of the California Law Revision Commission accompanying these sections suggest that no exception was intended to apply to a statement of intent to commit a crime alone. The comment on Evidence Code section 956 states only that "California now recognizes this exception. Abbott v. Superior Court, 78 Cal.App.2d 19, 177 P.2d 317 (1947). *Cf.*

Nowell v. Superior Court, 223 Cal.App.2d 652, 36 Cal.Rptr. 21 (1963)." (29B West's Ann. Evid. Code (1966 ed.) § 956, p. 553.) The comment on Evidence Code section 981 states, however, with regard to substantially the same wording: ". . . It is important to note that the exception provided by Section 981 is quite limited. It does not permit disclosure of communications that merely reveal a plan to commit or plan to commit a crime or fraud; it permits disclosure only of communications made to *enable* or *aid* anyone to commit or plan to commit a crime or fraud. Thus, unless the communication is for the purpose of obtaining assistance in the commission of the crime or fraud or in furtherance thereof, it is not made admissible by the exception provided in this section." (Italics added.)

The authorities relied upon by the People do not support the argument that the attorney-client privilege does not extend to statements of intent to commit future crimes. *United States* v. *Friedman* (9th Cir. 1971) 445 F.2d 1076 said that communications lose their privileged character "when they concern contemplated unlawful acts by the client. Calif.Evid.Code § 956 . . ." (*id.* at p. 1085), but in a more complete statement correctly held: "The attorney need not himself be aware of the illegality involved; it is enough that the communication furthered, or was intended by the client to further, that illegality." (*Id.* at p. 1086.)

*Abbott* v. *Superior Court* (1947) 78 Cal.App.2d 19, 21 [177 P.2d 317], relied on by the California Law Revision Commission to support its comment that Evidence Code section 956 states the existing law, also involved communications intended to further a client's unlawful purpose. While the court did state that "[t]he continuous and unbroken stream of judicial reasoning and decision is to the effect that communications between attorney and client having to do with the client's contemplated criminal acts, or in aid or furtherance thereof, are not covered by the cloak of this privilege" (78 Cal.App.2d at p. 21), the actual holding was that the privilege did not cover communications in which the defendant, an attorney, "was counseling a fellow member of the conspiracy in an attempt to further its illegal purposes." (*Ibid.*) Thus, the "existing law" to which the comment accompanying Evidence Code section 956 refers is consistent with the language of the section, that the privilege does not encompass communications between attorney and client that are intended to further future criminal conduct.[31]

Cases decided since the adoption of the Evidence Code recognize the limited nature of the exception to the attorney-client privilege created by

---

[31] In *Nowell* v. *Superior Court* (1963) 223 Cal.App.2d 652, 657 [36 Cal.Rptr. 21, 2 A.L.R.3d 853], the court again, quoting from *Abbott,* states the exception in broad, alternative language relating to communications " 'having to do with the client's contemplated criminal acts, or in aid or furtherance thereof . . .' " but once again the communications in issue were asserted to be ones in which the client sought legal advice that would further his criminal purpose.

Evidence Code section 956: "This exception is invoked only when a client seeks or obtains legal assistance 'to enable or aid' one to commit a crime or fraud. The quoted language clearly requires an intention on the part of the client to abuse the attorney-client relationship, . . ." (*Glade* v. *Superior Court* (1978) 76 Cal.App.3d 738, 746 [143 Cal.Rptr. 119]. See also, *BP Alaska Exploration, Inc.* v. *Superior Court* (1988) 199 Cal.App.3d 1240, 1249 [245 Cal.Rptr. 682]: "Evidence Code section 956 codifies the common law rule that the privilege protecting confidential attorney-client communications is lost if the client seeks legal assistance to plan or perpetrate a crime or fraud.")

The People finally contend, however, that even if erroneously admitted, the evidence was not prejudicial. We agree. Defendant's statements to Dr. Weinberger were a minor aspect of the overwhelming evidence of aggravating factors reflected in the circumstances of the crime itself. That evidence included evidence of defendant's willingness to commit serious crimes, including murder, to vindicate his beliefs. Whatever impact the evidence that he would also like to kill others who offended his sense of rectitude might have had was tempered by his testimony that he no longer believed that revenge was appropriate. We conclude, therefore, that it is not reasonably possible that a reasonable jury would have rendered a different verdict had the evidence been excluded. (*People* v. *Brown* (1988) 46 Cal.3d 432, 449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### 7. *Other Evidence.*

Defendant complains that the trial court erred in admitting various items of evidence, to which he failed to object.

Among these items of evidence were numerous photographs of the body of David Gawronski depicting the extent of the burns he suffered, and of Ava Gawronski depicting her injuries at different stages of treatment and rehabilitation. The photographs were admitted to illustrate the testimony of a treating physician and of Ms. Gawronski's father. ■■■ Defendant concedes that no objection to the admission of the photographs was made at the second penalty trial, but argues that objection was unnecessary since the court had overruled counsel's objection to the admission at the first penalty trial. We disagree. In none of the authorities cited by defendant for that proposition had the objection been made in an earlier trial. While it may not be necessary to renew an objection already overruled in the same trial (see, e.g., *People* v. *Antick* (1975) 15 Cal.3d 79, 95 [123 Cal.Rptr. 475, 539 P.2d 43]), absent a ruling or stipulation that objections and rulings will be deemed renewed and made in a later trial (see, e.g., *People* v. *Bell* (1989) 49 Cal.3d 502, 520-521 [262 Cal.Rptr. 1, 778 P.2d 129]), the failure to object

bars consideration of the issue on appeal. (Evid. Code, § 353, subd. (a).) The reason for the rule is manifest. Not only might a party elect different trial tactics at a second trial,[32] but the trial court being more fully informed must be given the opportunity to reconsider the prior ruling. A defendant may not acquiesce in the admission of possibly excludable evidence and then claim on appeal that rulings made in a prior proceeding render objection unnecessary. In the absence of an objection there was no error in admitting the evidence and no issue cognizable on appeal as to the propriety of its admission.

 Defendant also asserts that admission of evidence of his prior unadjudicated criminal activity that did not involve violence, and of his threats to commit crimes of violence, was error. He argues now that his failure to object to this evidence should be excused because this court had not yet held that evidence irrelevant to a statutory aggravating factor was irrelevant and inadmissible.

Again we conclude that the failure to object precludes consideration of the claim of error. It is true that the court held subsequent to the trial of this case in *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782] that evidence of violent activity or threats of violent activity directed to property was inadmissible. We did so, however, because section 190.3 "expressly excludes evidence of criminal activity, except for felony convictions, which activity 'did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence.'" (38 Cal.3d at p. 776.)

Our reference was to the admonition in section 190.3 that "*[N]o evidence shall be admitted regarding other criminal activity* by the defendant which did not involve the use or attempted use of force or violence or which did

---

[32] Indeed, just such a change occurred in this trial. Defendant elected to represent himself for the purpose of limiting certain arguably mitigating evidence. In addition, the parties agreed that Ms. Gawronski would not be called as a witness. The record affords no basis on which a reviewing court could determine with assurance whether the failure to object was tactical. Defendant's insistence that the appropriate punishment be determined by a jury and his argument to the jury support an inference that he wanted the jury to see the photographs so that the jurors would appreciate the enormity of the consequences of his actions. In closing argument defendant twice told the jury that he did not want the jurors to forget "for a moment" what he did, and made express reference to the photographs: "You saw that family. What I did—the word 'arson-murder' and the word 'great bodily injury' to Ava Gawronski I don't really think indicated what I did. I think these photographs may indicate what I did. They are not pleasant. I don't think you necessarily want to look at them again, but I also don't think that for a moment you should ever forget what I did."

Equally important, had the objection been renewed at the second penalty trial, the context in which the court would have weighed the probative value of the evidence against its possibly prejudicial impact would have been quite different.

not involve the express or implied threat to use force or violence." (Italics added.) To the reader that language did not distinguish violent property crimes and crimes against the person. In the face of an express statutory command governing the admissibility of evidence a party may not complain that failure to object is excused because he could not be held to anticipate a judicial decision holding that the statute means just what it says, but limits its application. This is not a situation in which an unreasonable burden is placed on a party by expecting him to understand the meaning of a statute or in which because of prior controlling law an objection would have been futile and is therefore excused.[33] (Cf. *People* v. *Ogunmola* (1985) 39 Cal.3d 120, 123 [215 Cal.Rptr. 855, 701 P.2d 1173]; *People* v. *Hillery* (1965) 62 Cal.2d 692, 711 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Kitchens* (1956) 46 Cal.2d 260, 262-263 [294 P.2d 17].)

In reaching this conclusion we "undertake to determine the state of the law as it would have appeared to competent and knowledgeable counsel at the time of the trial of the instant case . . . ." (*People* v. *De Santiago* (1969) 71 Cal.2d 18, 23 [76 Cal.Rptr. 809, 453 P.2d 353].) A defendant appearing in propria persona is held to the same standard of knowledge of law and procedure as is an attorney. (*Faretta* v. *California, supra,* 422 U.S. 806, 834-835, fn. 46 [45 L.Ed.2d 562, 581]; *People* v. *Bloom, supra,* 48 Cal.3d at pp. 1226-1227.)

 Defendant relies on the same reasoning to excuse his failure to object to the admission of Dr. Hatcher's testimony. Again, however, we conclude that the failure to object precludes consideration of the issue on appeal. We also conclude that the evidence was admissible in any case since it related to the circumstances of the offense.

Dr. Hatcher had testified over objection at the first trial, but as a rebuttal witness, to offer his expert opinion that the counseling given defendant by Ms. Gawronski was professionally competent. At the penalty retrial he

---

[33] Defendant suggests that an objection would have been futile because the only authority on the admissibility of evidence unrelated to a statutory aggravating factor was the holding in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 773 [175 Cal.Rptr. 738, 631 P.2d 446], that admission of evidence under the 1977 death penalty law was "not limited to matters relevant to the specified aggravating or mitigating factors."

This argument is speculative with regard to the ruling that the court might have made had there been an objection, and, we think, unfounded. The evidence in question in *Murtishaw* was expert opinion that the defendant would commit violent acts in the future. It was not evidence that came within the express statutory exclusion included in former section 190.3 of the 1977 law (Stats. 1977, ch. 316, § 11, p. 1259) and in the present section 190.3 prohibiting admission of evidence of other criminal activity that did not involve the use or attempted use of force or violence or threats to use force or violence. Competent counsel would not understand our opinion in *Murtishaw* to imply that evidence that arguably fell within that statutory exclusion was admissible, and that an objection would be futile.

testified regarding his diagnosis and the factors that led him to that diagnosis. While those factors did include statements defendant made to Dr. Hatcher regarding his thoughts subsequent to the offense, all were relevant to the diagnosis, and that diagnosis was relevant to the circumstances of the offense committed by defendant. Dr. Hatcher's testimony went directly to defendant's motive.

 ██ ██ We note also that the failure to object may well have been a tactical decision on the part of defendant since he relied on Dr. Hatcher's diagnosis as mitigating, in fact as the only possibly mitigating evidence he could suggest that the jury consider.[34] For this reason we need not consider defendant's claims (1) that because Dr. Hatcher was not appointed to offer an opinion on defendant's mental state at the time of trial, defendant did not waive his privilege against self-incrimination when he agreed to the interview, and (2) that the court should have given a limiting instruction advising the jury that defendant's statements to Dr. Hatcher could be considered only as factors relevant to the diagnosis. (Evid. Code, § 355; *People* v. *Coleman* (1989) 48 Cal.3d 112, 151 [255 Cal.Rptr. 813, 768 P.2d 32].)

8. *Instructions: Unadjudicated Criminal Conduct and Threats of Violence.*

Defendant contends that even if the evidence of his automobile arson and threats was properly admitted the court erred in instructing the jury that this evidence and other evidence of criminal conduct could be considered in aggravation.

The court instructed the jury: "Evidence has been introduced for the purpose of showing aggravating circumstances that the defendant, . . . shot at people in automobiles in 1966; the arson of an automobile in 1967; the ice axe assault on Ava Gawronski; the attempted rape of Ava Gawronski; the threats toward the lives of Michael Lerner and Joe Brassell; and the letters written to Ava Gawronski and George Lerner, which involve the express or implied use of force or violence." The instruction also required that the jury

---

[34]Defendant's claim that the testimony was inadmissible because he did not receive adequate notice of its content is equally unavailing. (§ 190.3.) Not only had he been advised that Dr. Hatcher would be a witness, but he had heard the witness's testimony at the first trial. Further, the notice requirement is intended to afford the defendant opportunity to prepare to meet the People's evidence of aggravating factors. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 96; *Keenan* v. *Superior Court* (1981) 126 Cal.App.3d 576, 587 [177 Cal.Rptr. 841].) If a defendant believes the notice given was not adequate he may object and seek a continuance for that purpose. The failure to object, however, waives any subsequent claim that the notice was not adequate. (*People* v. *Robertson* (1989) 48 Cal.3d 18, 45-46 [255 Cal.Rptr. 631, 767 P.2d 1109].)

find beyond a reasonable doubt that defendant did those acts before considering them as evidence in aggravation.

No instructions were requested or given on the elements of any crime or crimes that defendant may have committed by this conduct. There is no sua sponte obligation to instruct on the elements of other crimes at the penalty phase, however. (*People* v. *Howard* (1988) 44 Cal.3d 375, 437, fn. 25 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) Moreover, the instructions that the court intended to give were discussed with the prosecutor and with defendant, who stated that "[t]hese are fine" when asked if he wished any special instructions. Among the instructions given by the court were those defining ·the elements of the crimes of which defendant had been convicted. Those instructions advised the jury of the elements of arson (of a house) and rape, but did not define attempt.

Defendant first complains that it was improper to instruct the jury that it could consider the evidence of his threats and his automobile arson because the threats were not criminal conduct and the automobile arson was not a crime of violence toward persons. Therefore, he argues, the evidence was not relevant to a statutory aggravating factor. (*People* v. *Philips, supra,* 41 Cal.3d 29, 72; *People* v. *Boyd, supra,* 38 Cal.3d 762, 775.)

 We have not heretofore considered whether it is error to instruct a capital jury that evidence admitted without objection that is logically relevant to the penalty determination, but is not legally relevant because it is not evidence related to a statutory factor, may be considered as evidence of an aggravating factor. The question has arisen in other contexts, however.

In *People* v. *Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203], the defendant did not object to evidence of alleged suppression of evidence by defendant's attorney. Because there was no showing that the defendant was aware of or authorized the action, the evidence would not support an inference that the suppression reflected defendant's consciousness of guilt, i.e., the evidence was not sufficiently relevant to be admissible. The court instructed the jury on suppression of evidence and consciousness of guilt. We held that the failure to object to the admission of the evidence waived any error. "Lack of objection at that time did not, however, waive defendant's right to appellate review of the propriety of the court's jury instruction on the issue of suppression of evidence and consciousness of guilt because the Legislature has specifically provided that an objection is not required in order to preserve instruction issues affecting the substantial rights of a defendant. (Pen. Code, § 1259.) *As the record contains no evidence to support the suggested inference, the court erred in giving the*

*instruction.* " (19 Cal.3d at p. 600, italics added. See also, *People* v. *Harris* (1981) 28 Cal.3d 935, 956-957 [171 Cal.Rptr. 679, 623 P.2d 240].)

In *Hannon,* the evidence of the attorney's conduct was not relevant to the defendant's guilt. In the instant case, by contrast, the evidence of defendant's prior criminal conduct and threats of violent conduct is logically relevant to the appropriate penalty. Permitting the jury to consider relevant evidence did not contravene any constitutional provision. We conclude, therefore, that it was not error for the trial court to instruct the jury that the evidence could be considered aggravating evidence. A defendant may not permit relevant aggravating evidence to come in without objection and then complain that the court permitted the jury to consider it.

Even were we to conclude that the instruction should not have been given, we do not believe reversal would be required. The only reference during the prosecutor's argument to defendant's threats to kill was not to the threats as an aggravating factor within section 190.3. He did not argue that the threats were evidence of criminal conduct or of a potential for future violent conduct, but simply asked the jury to consider "the terror that Joe Brassell and Michael Lerner must feel, knowing that a man that has committed murder before, that is bright enough, has threatened their lives. Tom Peters, the same. Mr. Clark has thought, 'if I can make them feel uneasy, that's exactly what I wanted to do.'" And with respect to the automobile arson and the 1966 shooting incidents, the prosecutor told the jury that "those aren't really aggravating circumstances. At least I did not present those to you in the form of an aggravating circumstance, but more importantly to show you that Mr. Clark's state of mind on January 6, 1982 existed some ten to fifteen years earlier. Long before Ava Gawronski was even known by the defendant." The emphasis was thus on defendant's penchant for causing others to undergo mental anguish, not on the relevance of the threats as indicators of future violent conduct, or on defendant's past criminal conduct as aggravating factors. We see no possibility therefore that the court's invitation to the jury to consider the evidence may have had an impermissible impact on the verdict.

9. *Victim Impact Evidence.*

█ Defendant next contends that evidence of the impact of the murder of David Gawronski on the families of the victims was erroneously admitted, and the prosecutor was improperly permitted to argue its force.

The evidence in question is the testimony of George Lerner, Ms. Gawronski's father, which included a brief comment about the effect of defendant's criminal acts on her parents and daughter. Subsequent to the

trial of this case the United States Supreme Court held in *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] that the Eighth Amendment prohibits consideration of some victim impact evidence by a capital sentencing jury. The court reasoned that the character and reputation of the victim of a capital offense and the effect of the victim's death on his family "may be wholly unrelated to the blameworthiness of a particular defendant" and thus could divert the focus of the sentencer's attention away from the relevant considerations—the defendant's background and record and the circumstances of the crime. (*Id.* at pp. 504-505 [96 L.Ed.2d at pp. 449-450].)

The court indicated, however, that evidence of the impact of the defendant's conduct on persons other than the homicide victim might be relevant in a particular case if related directly to the circumstances of the crime (482 U.S. at p. 507, fn. 10 [96 L.Ed.2d at p. 451]), and renewed that suggestion in its recent decision in *South Carolina* v. *Gathers* (1989) 490 U.S. 805, __ [104 L.Ed.2d 876, 882-883, 109 S.Ct. 2207]. In *People* v. *Karis* (1988) 46 Cal.3d 612, 641 [250 Cal.Rptr. 659, 758 P.2d 1189], we held that the impact of a capital defendant's past crimes on the victims of those crimes was relevant to the penalty decision. Certainly the impact of a defendant's current homicidal conduct on persons injured, but not killed, by that conduct is equally relevant to the penalty decision. Since the victim impact evidence presented in this case related almost exclusively to the injuries that led to the death of David Gawronski, and to the horrendous injuries suffered by Ava Gawronski and their aftermath, any possible error in admitting evidence that these victims' relatives suffered emotional distress must be deemed harmless beyond a reasonable doubt. (See *People* v. *Lewis, ante,* 262, 284-285 [266 Cal.Rptr. 834, 786 P.2d 892].)

### 10. *Prosecutorial Misconduct.*

Defendant asserts as misconduct the prosecutor's opening statement in which he restated the theory of the case which, defendant contends, the first jury rejected—that defendant had intended to kill all three members of the Gawronski family when he went to the house, and had first set the fire in the hallway and living room of the house to block their escape. Defendant claims that this attempt to have the jury accept the prosecutor's theory of the case violated principles of collateral estoppel and double jeopardy because the first jury had necessarily rejected the evidence that would have supported the theory when it returned verdicts of attempted second degree murder.

Whatever the merit of defendant's deductive reasoning as to the basis for the attempted second degree murder verdicts, defendant failed to

object to the prosecutor's statement at a time when an admonition could have cured any harm. He thereby waived the right to complain on appeal about the alleged misconduct. (*People* v. *Walker* (1988) 47 Cal.3d 605, 629-630 [253 Cal.Rptr. 863, 765 P.2d 70]; *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 758; *People* v. *Green, supra,* 27 Cal.3d 1, 34.)

Defendant also failed to object to the other instances of what he now characterizes as prosecutorial misconduct—reading from one of defendant's letters during the opening statement and thereby letting the jury know that the penalty phase was being retried, a statement suggesting that retrial was mandatory after dismissal, and an assertion that there were no mitigating factors. While we conclude that the failure to object is not excused here, we do not suggest that we agree that the conduct complained of was improper or prejudicial.

Defendant did not object to admission of the letters and testified that he had written the letters to Ms. Gawronski and her father to provoke a retrial of the penalty before a jury. He again referred to this purpose in his argument to the jury. Assuming therefore that reading defendant's own statement from the letters was improper, it could not have caused any prejudice.

The reference to mandatory retrial of the penalty if the first jury is unable to agree came in the form of a question put to defendant after he testified that his purpose in writing the letters was not to threaten harm or cause further grief, but to anger the recipients and the prosecutor sufficiently that they would agree that the penalty phase should be retried. In an effort to impeach defendant the prosecutor asked him if he was aware that retrial was mandatory. Section 190.4, subdivision (b), expressly provides that in the event the jury cannot reach a verdict at the penalty phase "the court shall dismiss the jury and shall order a new jury impaneled . . . ." Defendant argues that we should not construe this provision as one which compels the prosecutor to continue to seek the death penalty. We need not decide that question, however, to recognize that the question put to defendant was not improper. It did no more than ask him if he was aware of the law, and was proper. (See *People* v. *Harris, supra,* 47 Cal.3d 1047, 1083, fn. 17.)

Defendant's claim, that the prosecutor improperly stated that there were no mitigating factors, isolates a single statement which in context was clearly a statement of the prosecutor's opinion of what the evidence established. ■ Argument that states the prosecutor's conclusions as to the weight of evidence and conclusions to be drawn from it is proper. (*People* v. *Allison* (1989) 48 Cal.3d 879, 894 [258 Cal.Rptr. 208, 771 P.2d 1294]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789-790 [230 Cal.Rptr. 667, 726 P.2d 113].)

11. *Instructional Error.*

a. *Brown (CALJIC No. 8.84.2) error.*

 Defendant next claims inadequacy in the court's instructions to the jurors that if they concluded that the aggravating circumstances outweighed the mitigating circumstances "you shall impose a sentence of death," which allegedly misled the jury as to the scope of its sentencing discretion and responsibility.[35]

We agree that the instructions in question could have been misunderstood. In *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440] (reversed on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we recognized that instructions like those given here in the mandatory language of section 190.3 were potentially misleading. Construing section 190.3 consistently with the settled constitutional principles by which the validity of a death penalty law is to be assessed under the Eighth Amendment to the United States Constitution, we held that a capital jury is required to do more than simply find facts that determine the penalty decision. The jury must make a moral assessment of those facts as they relate to whether death is appropriate for the individual defendant, and must be free to reject death on the basis of any constitutionally relevant evidence. The jurors must, therefore, weigh the aggravating and mitigating factors, assigning whatever moral or sympathetic value each juror deems appropriate to each, and upon completion of the weighing process must decide if death is the appropriate penalty. (40 Cal.3d at pp. 540-541.)

In recent decisions, the United States Supreme Court has confirmed our understanding of the command of the Eighth Amendment. Instructions must be adequate to inform the jury that it may consider and give effect to any mitigating evidence regarding the defendant's background or character, or to the circumstances of the crime regardless of statutory language that might be understood to limit the jury's discretion in determining the appropriate punishment. The jury must understand that it is free to give a "reasoned moral response" to such evidence in making its decision. (*Penry* v.

---

[35] The jury was instructed: "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

*Lynaugh* (1989) 492 U.S. \_\_, \_\_ [106 L.Ed.2d 256, 279, 109 S.Ct. 2934]; *Hitchcock* v. *Dugger* (1987) 481 U.S. 393 [95 L.Ed.2d 347, 107 S.Ct. 1821].)

A juror might understand instructions such as those given here in the statutory language of section 190.3 to limit the jury's function to finding facts or mechanically counting the factors to determine if the number of aggravating factors was greater than the number of mitigating factors, in which case imposition of the death penalty was compelled. The jurors might also believe that they were required to vote to impose the death penalty if they concluded that the evidence in aggravation outweighed that in mitigation even though they might not conclude that death was the appropriate penalty under all of the circumstances. When such instructions have been given without clarification, therefore, we must determine based on our review of the entire record, including the instructions as a whole and the argument of counsel, whether the jury may have been misled with respect to its sentencing discretion and responsibilities. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1037 [254 Cal.Rptr. 586, 766 P.2d 1]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115]. See also *Penry* v. *Lynaugh, supra,* 492 U.S. \_\_, \_\_ [106 L.Ed.2d 256, 278].)

Having done so, we see no possibility that the jury was misled in this case. The court also instructed the jury: "You are the sole judges of the respective weight to be given the evidence in aggravation and mitigation presented to you during this trial. The impact and degree of persuasion you accord such evidence is guided only by its relative convincing force." Neither the prosecutor nor defendant made reference to the decision to be made by the jury as one that was either mechanical or compelled by the law.[36] Rather, each emphasized that the jury must determine the "appropriate" penalty based on all of the evidence. Thus the prosecutor emphasized that "it is a balancing test, aggravating circumstances weighed against mitigating circumstances." He then addressed the evidence and how it might be characterized. His only reference to the mandatory aspect of the law was in

---

[36] In claiming that the jurors were misled, defendant relies almost entirely on questions put to them on voir dire when each was asked if he or she would be able to follow the law and to vote to impose the death penalty if he or she found that the aggravating circumstances outweighed the mitigating. His argument overlooks the care taken during voir dire by defendant to ensure that these prospective jurors understood the nature of their task, asking whether each understood that the weighing process was not simply a matter of counting evidence, and that the number of items of evidence was not relevant, as "the weighing process is a qualitative process."

It was the subsequent argument of counsel and instructions by the judge, moreover, that gave meaning to the role the jurors were to play in determining whether the aggravating factors outweighed the mitigating. We have never considered questions put on voir dire that do no more than ask potential jurors if they can follow the law which is to be explicated later a basis for concluding that those selected as jurors might not understand instructions given subsequently. We decline to do so now.

the context of his assessment that the evidence reflected no mitigating factors. In his closing argument, after arguing that the jury should consider defendant's past conduct rather than his present self-analysis of his character and mental state, the prosecutor commented: "He didn't tell you any mitigating circumstances because there aren't any, and that's why under the law in the State of California, the punishment in this case shall be death, and I ask you to return that." Defendant responded that if the jury would "weigh the evidence as best you can and follow the law, and do what you think is right, that's all that anyone could ask of you."

Nothing in this record suggests that the jury did not understand that it was performing what we have described as "an essentially normative task, acting as the community's representative, that it may apply its own moral standards to the aggravating and mitigating evidence presented, and that it has ultimate responsibility for determining if death is the appropriate penalty for the particular offense and offender." (*People* v. *Edelbacher, supra,* 47 Cal.3d 983, 1037.) Indeed, in his testimony and his argument defendant repeatedly asked the jury to do just that.

b. *Consequences of verdict—CALJIC No. 1.00.*

The jury was also instructed that it was expected to "reach a just verdict regardless of what the consequences of that verdict may be." We have stated that a penalty phase jury should not be instructed that it must "disregard the consequences of its decision." (See *People* v. *Malone* (1988) 47 Cal.3d 1, 43 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Jennings* (1988) 46 Cal.3d 963, 990 [251 Cal.Rptr. 278, 760 P.2d 475].) Our purpose was to ensure that the jury understands that whether the defendant is to live or die is the precise issue it is to decide, and that the responsibility for the decision lies with the jury alone. It is constitutionally impermissible to instruct a jury in a manner that leads the jury to believe that ultimate responsibility for the determination of the appropriate punishment lies elsewhere. (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 239, 105 S.Ct. 2633]; *People* v. *Jennings, supra,* 46 Cal.3d 963, 991; *People* v. *Milner* (1988) 45 Cal.3d 227, 253-254 [246 Cal.Rptr. 713, 753 P.2d 669].)

The disapproved instruction was given here but it is clear that the jurors could not have understood this to mean that they must not consider the nature of the decision they were called upon to make. The tenor of the argument and the remaining instructions made it clear to the jury that it and it alone was to decide whether defendant should live or die. Although the instruction should not have been given, it was not prejudicial.

### c. *Evidence of mental or emotional disturbance.*

■■■ The court instructed the jury in the language of factor (d) of section 190.3, that in making a penalty determination the jury should consider "whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Defendant contends that this instruction impermissibly restricted the consideration of mitigating evidence of mental or emotional disturbance that was less than "extreme," and thereby violated his right under the Eighth Amendment to have the jury consider any aspect of his character and background that might be relevant to the appropriate penalty. (*Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110-113 [71 L.Ed.2d 1, 8-10, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954].)

Neither this instruction nor any argument by the prosecutor, however, suggested that only extreme mental or emotional disturbance should be considered. Other instructions advised the jury that it should consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." It is clear in this case the jury fully understood that all of the mitigating evidence offered by defendant could and should be considered. (See *People* v. *Murtishaw, supra,* 48 Cal.3d at p. 1033; *People* v. *Morales* (1989) 48 Cal.3d 527, 567 [257 Cal.Rptr. 64, 770 P.2d 244]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].)

### 12. *Application for Modification of Penalty.*

Section 190.4, subdivision (e), provides that if a capital jury returns a verdict of death the defendant is deemed to have made an application for modification of the verdict, and directs: "In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

■■■ Because the function of the judge in ruling on the motion for modification is to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict (*People* v. *Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627]), the only evidence the court is to review is that which was before the

jury. (*People* v. *Lewis, supra, ante,* 262, 287; *People* v. *Jennings, supra,* 46 Cal.3d 963, 995.)

Defendant complains that the trial judge improperly considered evidence contained in a probation report when ruling on the section 190.4 motion, and that this evidence as well as the improperly admitted victim impact evidence influenced his decision to deny the motion.

The record confirms that the court had read the probation report and did refer to its content in his statement. Here, however, unlike *People* v. *Lewis, supra, ante,* 262, 286-287, the record confirms that the report did not contribute to the decision. Two of the aspects of the report to which the judge referred were ones favorable to defendant—that he had no formal criminal record and had admitted his involvement voluntarily at a very early stage of the proceedings. Another—that by defendant's own statement he "felt a certain justification for his conduct because Ava Gawronski broke her promise and went back on her word"—was apparent from evidence that had been presented to the jury. Only the statement that Ms. Gawronski considered defendant "dangerous, manipulative and cunning as reflected in the probation report" may reflect evidence not directly considered by the jury. The trial judge had no need to rely on the opinion of Ms. Gawronski to reach such a conclusion, if in fact the judge agreed. The prosecutor had already argued to the jury, based on evidence presented to the jury, that defendant was dangerous and manipulative. There is no possibility that had the judge not read the probation report his ruling on the modification motion would have differed.

### 13. *Proportionality.*

Defendant contends that imposition of the death penalty in this case violates article I, section 1, of the California Constitution. (See *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 423 [105 Cal.Rptr. 217, 503 P.2d 921].) We disagree. The calculated nature of defendant's conduct; his intent to kill the murder victim, and to cause grievous suffering to the victim's surviving wife; his decision to proceed with the plan to ignite gasoline in the victims' bedroom even after he became aware that the room was occupied; and his avowed intent to kill or cause to be killed other persons whose conduct offended him, fully justify the penalty and refute any suggestion that the penalty is disproportionate. (See *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1187 [259 Cal.Rptr. 701, 774 P.2d 730]; *People* v. *Jennings, supra,* 46 Cal.3d 963, 995; *People* v. *Karis, supra,* 46 Cal.3d 612, 649.)

ATTEMPTED MURDER VERDICTS

14. *Instructions/Sufficiency of Evidence.*

 Defendant contends that his convictions for attempted murder must be reversed because the court failed to instruct on the lesser included offenses of assault (§ 240) and assault by means of force likely to cause great bodily injury (§ 245), and because the evidence is insufficient to support a finding of intent to kill Sara Gawronski.

The evidence was sufficient. Evidence was presented that defendant considered whether to proceed with the arson after becoming aware that he would ignite gasoline vapor in the room occupied by the infant's parents, and decided to do so because he had sufficient hate and anger to go through with his plan. He knew that the child was too young to save herself from the fire he deliberately set. That evidence was sufficient to support an inference that he intended to kill the entire family.

Sua sponte instructions on assault were not required. Section 1159 authorizes the trier of fact to "find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." An offense is necessarily included in another if (1) the greater statutory offense cannot be committed without committing the lesser because all of the elements of the lesser offense are included in the elements of the greater; or (2) if the charging allegations of the accusatory pleading include language describing it in such a way that if committed in that manner the lesser offense must necessarily be committed. (*People* v. *Geiger* (1984) 35 Cal.3d 510, 517, fn. 4 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]; *People* v. *St. Martin* (1970) 1 Cal.3d 524, 536 [83 Cal.Rptr. 166, 463 P.2d 390].)

Defendant does not claim that either assault or assault by means of force likely to cause great bodily harm is an offense necessarily included with a charge of murder. He claims instead, relying on *People* v. *Marshall* (1957) 48 Cal.2d 394 [309 P.2d 456], that these offenses were included within attempted murder "as charged" in the information. Not so. While both attempted murder and arson were charged, the charges were made in separate counts. The allegations of the complaint did not refer in any count to assaultive conduct. No authority is offered for the proposition, implicit in defendant's claim, that arson is assaultive conduct,[37] or for his reasoning

---

[37] Count III alleged that defendant "did willfully, unlawfully and with malice aforethought attempt to murder Ava Gawronski, a human being" and "with the intent to inflict such injury, personally inflicted great bodily injury upon Ava Gawronski. . . ." The allegations of the

that because both arson and attempted murder were charged in the information the attempted murder charges, as pleaded, included allegations of assaultive conduct.

Not only was the court under no obligation to give instructions on assault and/or assault by means of force likely to do great bodily harm, to have done so would have been error of constitutional dimension. (See *People* v. *Geiger, supra,* 35 Cal.3d 510, 526; *People* v. *Lohbauer* (1981) 29 Cal.3d 364, 368-369 [173 Cal.Rptr. 453, 627 P.2d 183].)

## DETERMINATE SENTENCING

### 15. *Section 654.*

■ There is merit to defendant's claim that the trial court erred in failing to stay the term imposed for the arson count pursuant to section 654. The arson, murder, and attempted murders were committed by the act of igniting the fires in the victims' home. Accordingly, section 654 mandates that execution of the term imposed for arson be stayed pending not only service of the term imposed for the murder, but also the terms for attempted murder. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 639-640 [105 Cal.Rptr. 681, 504 P.2d 905]; *In re Wright* (1967) 65 Cal.2d 650, 653-656 [56 Cal.Rptr. 110, 422 P.2d 998].)

Because the commission of arson is an act of violence that is likely to cause harm to more than one person, however, section 654 does not prohibit punishment for each of the attempted murders and the murder. (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 20-21 [9 Cal.Rptr. 607, 357 P.2d 839].)

### 16. *Sentencing Rules.*

■ Rule 421(a)(3) of the Sentencing Rules for the Superior Courts, California Rules of Court, which govern imposition of determinate terms, identifies as an aggravating circumstance permitting imposition of the upper term the fact that "[t]he victim was particularly vulnerable." The trial court relied on this aggravating circumstance for imposition of the upper term for the rape of defendant's former wife.

---

count charging attempted murder of Sara Gawronski were the same, omitting, however, the great-bodily-injury allegation.

The arson count alleged only that defendant "did willfully and unlawfully and maliciously set fire to and burn and cause to be burned the property of another, to wit David and Ava Gawronski, located at [address]."

.

The "particularly vulnerable victim" factor supports imposition of the upper term if the victim is vulnerable "in a special or unusual degree, to an extent greater than in other cases [and is] defenseless, unguarded, unprotected, accessible, assailable . . . susceptible to the defendant's criminal act." (*People* v. *Smith* (1979) 94 Cal.App.3d 433, 436 [156 Cal.Rptr. 502].)

Although the trial court did not identify those aspects of defendant's conduct or the rape victim's circumstances that brought her within this category of victim, the evidence supports the court's conclusion that she was particularly vulnerable. Defendant used his prior relationship with her and knowledge gained thereby to persuade her to admit him to her apartment. He exploited her concern for the supposed illness of his mother, manipulated her trust, and thereby gained entrance to a location where she was alone, inaccessible, unprotected, and unable to protect herself from the assault. Imposition of the upper term was, therefore, permissible.

We also reject defendant's claim that the court erred in considering planning and premeditation as aggravating factors in electing to impose the upper term for the attempted murder of Ava Gawronski. While the jury may have determined that defendant did not premeditate the murder of Ms. Gawronski, he had indisputably premeditated and planned in advance the arson itself, and had done so for the purpose of causing her to suffer. Rule 421(a)(8) of the Sentencing Rules for the Superior Court, California Rules of Court, includes among the enumerated aggravating circumstances that may warrant imposition of the upper term the "planning, sophistication or professionalism with which the crime was carried out, or other facts, [which] indicate premeditation." Since the planned arson escalated into the attempted murder, this aggravating circumstance was properly relied upon by the sentencing judge.[38]

## CONCLUSION

The finding that defendant committed the murder charged in count II under the special circumstance of murder by means of explosives (§ 190.2, subd. (a)(6)) is stricken. The judgment is modified to direct that the term imposed on count V is stayed pending service of the terms imposed on

---

[38] The court also noted that the offense involved a high degree of cruelty and viciousness (Cal. Rules of Court, rule 421(a)(1)), which alone would support imposition of the upper term. Even were we to conclude that the planning and premeditation factor was inapplicable, defendant would be entitled to relief only if it appeared that the court might not have imposed the upper term had the judge been aware of its inapplicability. This is not such a case.

counts II, III, and IV, the stay to become permanent upon service of those terms. As modified, the judgment is affirmed.

Lucas, C. J., Panelli, J., and Kennard, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment of guilt, but agree with the views of Justice Broussard on the special circumstance of felony murder. I write separately to dissent from the judgment in the penalty phase.

The trial court committed prejudicial error in permitting the defendant to represent himself in the penalty phase of the trial. The bizarre nature of the crime and the irrational reasons motivating the defendant to commit the offense should have alerted the court to the mental inability of the defendant to adequately present evidence in mitigation.

The mental and emotional inadequacies of the defendant were emphasized not only by the facts of the bizarre crime, but by the analytical testimony of the experts who examined him in connection with these proceedings. Yet, strangely, the trial judge—and now the majority of this court—ignored the testimony and determined that this obviously mentally disturbed defendant was competent to present a rational defense to a jury contemplating whether he is to live or die.

Following are brief excerpts from the testimony of the medical experts who reviewed the mental capabilities of the defendant:

Dr. Chris Hatcher, a clinical psychologist: "Mr. Clark's behavior and history is most characteristic of an individual that would have a diagnosis of borderline personality . . . . Borderline personality is a category of individuals that fit in between neurosis and psychosis."

Dr. Kaushal Sharma, a psychiatrist: "Q. And would you describe Mr. Clark as being mentally impaired? A. Yes."

Dr. John M. Stalberg, the court-appointed psychiatrist: "Mr. Clark suffers from a borderline personality disorder. He is . . . emotionally unstable . . . . These emotional problems significantly interfere with his interpersonal, social and occupational relationships . . . Mr. Clark is a significantly disordered individual . . . ."

It is particularly noteworthy that in the first trial defendant was represented by counsel. The jury was not convinced that defendant should receive the death penalty; it was unable to reach a verdict. In a retrial, with defendant permitted to act as his own counsel, a jury returned a verdict of death.

It is probable that this resulted from defendant's inadequacy in acting on his own behalf. For example, the prosecutor introduced evidence of prior unadjudicated criminal activity that did not involve violence. This was clearly improper, yet defendant did not object. The majority conclude that his failure to object constituted a waiver of a claim of error. To hold this mentally disturbed defendant to the standard of an attorney in connection with admission of evidence, objections thereto and a knowing waiver of error is patently unrealistic.

Similarly in closing argument the prosecutor indulged in several instances of misconduct. No objection by this defendant, contend the majority, and therefore there was a waiver, thus preventing consideration on appeal. Again, this is an unrealistic requirement for a mentally impaired defendant appearing without counsel.

It is true that some cases hold a defendant acting in propria persona is not to receive special treatment, that he is to be held to the same standards as would counsel appearing for him. However, the fact that the prosecutor's opponent is appearing in propria persona, and undoubtedly is unfamiliar with the techniques and complexities of courtroom procedures, does not justify either the prosecutor or the court taking advantage of defendant's ignorance.

In his tormented mind the defendant did have a strategy for the penalty phase. It is apparent that he made no excuses for his actions. He stipulated that he had received competent care from the victim therapist and maintained that "I committed the murder because I wanted to and for no other reason." In his closing argument, for example, he repeatedly reminded the jury to remember exactly what he did. He even showed the jury a picture of the victims and their infant daughter taken before the fire, "In case there is any tendency to forget what I did or to minimize it . . . ." He admitted that he wrote threatening letters to "provoke" the prosecutor into retrying the case "because I wanted to see this trial decided—this penalty decided by a jury." He repeatedly argued that he did not wish to die, but maintained that "I also don't particularly want to live [if] the cost [of] that life is fear and anxiety for Ava [his therapist]." He suggested that "it doesn't seem reasonable to me that any rational person would conclude that I have a great deal of fear of either the death penalty or a life imprisonment verdict." Finally, defendant admonished the jury that he cares "very much" about Ava Gawronski and that if "you really believe that Ava Gawronski is living in fear of me, if you believe that my existence causes her any anxiety or discomfort, then I would certainly concur with Mr. Reid [the prosecutor] that death is the appropriate penalty." In essence, defendant was not arguing against the death penalty, but was attempting to convince the jury

that he cares about the victim and was somehow justified in his violent actions.

The majority rely on *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], to confirm the absolute right of defendant to represent himself at the penalty phase of a capital trial. Their reliance is misplaced for several reasons. First, *Faretta* was not a death case; Anthony Faretta was charged merely with grand theft and was specifically found by the court to be "literate, competent and understanding" (*id*. at p. 835 [45 L.Ed.2d at p. 582]). He had previously defended himself in another criminal case and apparently could handle a theft case as distinguished from a proceeding in which his very life might be involved. Nevertheless, there were persuasive dissents by Chief Justice Burger, and Justices Blackmun and Rehnquist, who spoke of "the injury to society" (*id*. at p. 849 [45 L.Ed.2d at p. 590]) from allowing a mere layman to conduct a criminal trial.

Second, *Faretta* was decided prior to and must be subject to *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978], in which the Supreme Court emphasized that "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."

Third, the majority apparently feel bound by *People* v. *Bloom* (1989) 48 Cal.3d 1194 [259 Cal.Rptr. 669, 774 P.2d 698]. With due respect to my colleagues, that case is a judicial aberration that cannot be long supported in law or logic. There the defendant, purporting to represent himself, put on no defense; he actually aided the prosecutor in seeking the death penalty and thus made a mockery of the adversary process. How that result serves the ends of justice in a civilized society completely escapes me.

In short, I do not believe *Faretta* compelled the trial court to permit this mentally disturbed defendant to dismiss his lawyer and represent himself at the penalty phase of the trial. Even if *Faretta* were to be deemed controlling, the trial court should have found this defendant incompetent to represent himself. And it is clear that in purporting to defend himself, defendant did not present mitigating evidence or in any manner create a reliable adversary proceeding.

I would set aside the finding of the special circumstance of felony murder and would reverse the penalty judgment. I would direct the trial court, if there is to be a new penalty proceeding, to appoint counsel for defendant.

**BROUSSARD, J.,** Concurring and Dissenting.—I agree with the majority opinion that the special circumstance of murder by means of explosives is inapplicable, but dissent from its conclusion that the special circumstance of felony murder can be sustained. The majority correctly recognize that the trial court erred in failing to instruct the jury, pursuant to *People v. Green* (1980) 27 Cal.3d 1, 61-62 [164 Cal.Rptr. 1, 609 P.2d 468], that the arson-murder special circumstance is applicable only when the defendant has an independent felonious purpose for the commission of the arson. That special circumstance is not applicable when the arson is simply incidental to, or committed to facilitate, the murder.

The majority conclude, however, that the error was not prejudicial. They point to evidence that defendant's initial plan was to set fires to drive the Gawronskis out of their house, then to shoot David Gawronski as he emerged. Defendant left buckets of gasoline by various doors to compel the Gawronskis to flee by the front door, and threw a bucket of gasoline and a highway flare into the Gawronskis' bedroom. Although recognizing that substantial evidence supports the jury's implied finding that "when defendant actually set fire to the gasoline in the Gawronski home, regardless of the order in which the rooms were torched, defendant intended to kill the family members" (maj. opn., *ante*, at p. 609), the majority conclude that "when he commenced the arson his intent was to start a fire that would drive the family out of the home. . . . His belated realization that the Gawronski bedroom was occupied, and his resolution to proceed with his plan nonetheless, does not negate the evidence that he had a purpose independent of causing the death of David Gawronski in his commission of arson." (Maj. opn., *ante,* at p. 609.)

This analysis is plainly wrong, on two counts. First, an essential element of the crime of arson is the burning of a part of the building. (See Pen. Code, § 451; *People v. Haggerty* (1873) 46 Cal. 354, 355; *Woolsey v. State* (1891) 30 Tex.App. 346 [17 S.W. 546] [setting fire to a bed insufficient to constitute arson of a building when the bed was removed, and the fire extinguished, before any part of the building burned].) Under the reasoning of the prosecutor, the implied findings of the jury, and the majority's own words, when defendant actually set fire to the gasoline in the Gawronski home—and thus when the burning commenced—his intent was to kill the family members by burning. The fact that defendant earlier entertained a different plan is irrelevant. When defendant actually committed the crime of arson, he did so intending to kill the victims by burning, and had no independent purpose for his action.

Second, even if defendant set the fire to cause the Gawronskis to go to a place where he could shoot and kill David, that would not constitute an

*independent* felonious purpose under the reasoning of *Green, supra,* 27 Cal.3d 1. In that case, defendant took the murder victim's purse and clothing to hinder identification and thus facilitate his escape. Although his acts constituted the crime of robbery, we held that because the robbery was merely incidental to the murder, it could not support a felony-murder special circumstance. (P. 62.) We explained that "the Legislature must have intended that each special circumstance provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not. . . . The [felony-murder] provision thus expressed a legislative belief that it was not unconstitutionally arbitrary to expose to the death penalty those defendants who killed in cold blood in order to advance an independent felonious purpose. . . . [¶] The Legislature's goal is not achieved, however, when the defendant's intent is not to steal but to kill and the robbery is merely incidental to the murder . . . because its sole object *is to facilitate* or conceal *the primary crime* . . . ." (P. 61, italics added.) Thus if, as here, the defendant's purpose in setting the fire is not to destroy property, but to drive the intended victim to a place where defendant can more easily kill him, the felony lacks a purpose *independent* from the murder, and cannot support a felony-murder special circumstance.

*Green* (*supra,* 27 Cal.3d 1) pointed out the absurdity that can result if a felony incidental to the murder can render the defendant eligible for the death penalty. In the context of that case, we explained that it would be irrational to hold "that this defendant can be subjected to the death penalty because he took his victim's clothing for the purpose of burning it later to prevent identification, when another defendant who committed an identical first degree murder could not be subjected to the death penalty if for the same purpose he buried the victim fully clothed—or even if he doused the clothed body with gasoline and burned it at the scene instead." (P. 61.) Similarly in this case it is irrational to hold this defendant is subject to the death penalty because he initially intended to set a fire to drive the victim from the house and then shoot him, when a defendant who from the beginning intended to burn the victim to death in the conflagration would not be subject to the death penalty, and neither would a defendant who planned to shoot the victim first and then burn down the house to conceal the murder.[1]

[1] Justice Kaufman finds an absurdity in the application of the *Green* rule to this case: that if defendant committed the arson intending to kill the victim and succeeded, he would not be death eligible since the burning was done to facilitate the murder, while if he committed the arson for an independent purpose but inadvertently killed an occupant, he would be subject to the death penalty. (Conc. and dis. opn. of Kaufman, J.,* *post,* at p. 655.) I agree that it is absurd for a defendant who kills unintentionally to be subject to the death penalty when a defendant who intended to kill is ineligible for that punishment—regardless of whether death

*Retired Associate Justice of the Court of Appeal sitting under assignement by the Chairperson of the Judicial Council.

The death penalty should not turn on such a narrow, technical and insignificant distinction as that invoked as a basis for the majority opinion.

I conclude that the trial court should have instructed the jury that to find a felony-murder special circumstance based on arson it must determine that defendant had an independent felonious purpose for the commission of the arson. The court's failure to so instruct was prejudicial error. Since neither the special circumstance of murder by means of explosives nor that of felony murder can be sustained, the findings of special circumstances and the penalty judgment should be reversed, and the case remanded for a new trial.

Mosk, J., concurred.

**KAUFMAN, J.,** * Concurring and Dissenting.—I concur in the judgment except for the portion ordering stayed the sentence for the arson conviction pending service of the sentence for murder and the sentences for attempted murder. I would affirm the judgment in its entirety. In my view the Penal Code section 654[1] issue is erroneously determined and a number of other issues are incorrectly analyzed and resolved by the majority. Further, one significant issue resolved by the majority, whether correctly or incorrectly, should not be resolved at all in this case because its resolution is unnecessary to deciding this case.

To get them out of the way I start with several errors in the majority opinion that would be of little importance if opinions of this court were not published.

### I.

In rejecting defendant's claim that assault instructions should have been given by the court, the majority erroneously and gratuitously states that "to have done so would have been error of constitutional dimension." (Maj. opn., *ante,* at p. 637.) Implicit in defendant's contention on appeal, however, is that he would have desired such an instruction and would not have objected to it. Under those circumstances there would have been no error, much less constitutional error, had such instructions been given. (See *People* v. *Toro* (1989) 47 Cal.3d 966 [254 Cal.Rptr. 811, 766 P.2d 577].) I agree, however, the court was not required to give such instructions sua sponte.

---

results from burning, shooting, knifing, or any other cause. But Justice Kaufman misplaces the source of the absurdity. It is found not in *People* v. *Green, supra,* 27 Cal.3d 1, but in the felony-murder special circumstances and its application to unintentional killers.

* Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council.

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## II.

The majority's conclusion that section 654 requires a stay of the sentence on the arson conviction (maj. opn., *ante,* at p. 637) is apparently based on the notion that the arson consisted of a single act rather than a course of conduct and that the evidence that defendant may have had an intent or objective in com.nitting the arson other than murder or attempted murder is of no consequence. I do not agree. The evidence plainly shows that the arson conviction was based upon several acts, in fact, two separate acts of throwing and igniting gasoline, so there was a "course of conduct" involved in the arson and the intent and purpose of defendant must be considered in determining whether that course of conduct can be punished under more than one penal statute.

Whether a course of conduct is to be considered a single act for purposes of section 654 depends upon whether the course of conduct was "indivisible," which in turn depends upon whether the defendant's acts were performed with the same intent and for the same purpose. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 637-638 [105 Cal.Rptr. 681, 504 P.2d 905]; see also *People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552]; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839].) That question is a question of fact to be determined by the trial court. (*People* v. *Porter* (1987) 194 Cal.App.3d 34, 38 [239 Cal.Rptr. 269]; *People* v. *Goodall* (1982) 131 Cal.App.3d 129, 148 [182 Cal.Rptr. 243]; *People* v. *Ferguson* (1969) 1 Cal.App.3d 68, 74-75 [81 Cal.Rptr. 418]; *People* v. *Scott* (1966) 247 Cal.App.2d 371, 375-376 [55 Cal.Rptr. 525].)

Impliedly, the trial court here determined the several acts involved in the arson were not committed with the same intent and objective. And clearly there is substantial evidence to support that determination. The first act of throwing gasoline into the house may have been committed, as defendant testified, merely to drive the occupants out of the house. Having heard the occupants screaming and apparently having concluded the occupants could not be forced out as he expected, the second act of throwing gasoline into the house could well have been committed by defendant with the intent to kill all the occupants. This seems likely because after he threw the second quantity of gasoline, defendant put the shotgun away in the trunk of the automobile he had rented and left the scene. Further, he stated that he realized at that time he could not carry out the plan "specifically" but intended "to carry out whatever other steps [he] had already preplanned." (Maj. opn., *ante,* at p. 608.)

I conclude the trial court was not required to stay sentence on the arson conviction. (Cf. *People* v. *Ramirez* (1979) 93 Cal.App.3d 714, 728-729 [156 Cal.Rptr. 94]; *People* v. *Ferguson, supra,* 1 Cal.App.3d 68, 75.)

I now turn to matters of greater import.

### III.

I agree the defendant's claim of reversible error in the court's restriction of the death qualification voir dire is not meritorious. And I agree that is so because the defendant, though not precluded from doing so, did not attempt in the general jury voir dire to inquire whether the severe burns suffered by the victims would cause one or more jurors automatically to vote for the death penalty. But that reason goes only to lack of prejudice; it does not at all answer the question whether the questions should have been permitted in the death qualification voir dire. Contrary to the conclusion of the majority I believe they should have been.

The reason is a simple and practical one. Under our practice, the death qualification voir dire is conducted in sequestration; that is, the other prospective jurors are not present and are not exposed to the repetition of inflammatory questions or the unknown, potentially prejudicial answers of other prospective jurors. (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301].) In my view, for many of the reasons given in *Hovey* for sequestering jurors for the death qualification voir dire, questions such as counsel wanted to ask here would be better asked in sequestration. No one knows in advance what the answers might be, how emotion packed they might be or what effect they might have on the other jurors.

The majority seems concerned with the possibility that the length of the death qualification voir dire might be overly extended by such questioning. But at the same time the majority concedes the same questions could be asked in the general voir dire. So where is the savings of time? In fact, it appears to me the procedure suggested by the majority would be awkward and more time-consuming. The majority apparently contemplates the asking of such questions at general voir dire unless and until an answer from some juror indicates a problem. The court and counsel would then be required to decide whether to air the matter within hearing of all the other prospective jurors or to go back into a sequestered voir dire session each time a problem arises. What sense does that make?

Further, I am far from persuaded the law supports the conclusion that such questions are outside the proper purview of the death qualification voir dire.

During the death qualification voir dire, defendant sought to inquire whether prospective jurors would automatically vote for the death penalty if

a victim suffered serious burn injuries of the kind suffered by one of the victims in this case. The court sustained the People's objection, ruling that defendant would not be permitted to ask the prospective jurors if the victim's injuries would determine their penalty verdict. The majority concludes that the proposed inquiry "was not relevant to the death qualification process" because that process "seeks to determine only the views of the prospective jurors about capital punishment in the abstract." (Maj. opn., *ante,* at p. 597.) In my view that conclusion unduly and improperly restricts the scope of the death qualification voir dire.

Under *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844], the proper standard for determining when a prospective juror may be excluded for cause because of the juror's views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " This standard was adopted as a matter of state law in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250]. Penalty phase jurors are instructed that in determining penalty they "shall consider, take into account and be guided by the aggravating and mitigating circumstances" as defined in the instructions and that they shall impose the death penalty if, and only if, the aggravating circumstances outweigh the mitigating circumstances. (§ 190.3.) If a certain factual circumstance by itself would cause a prospective juror automatically to vote either for or against the death penalty, regardless of other aggravating or mitigating circumstances, then that juror holds a capital punishment view impairing his or her ability to perform the duty of a penalty phase juror. Under the *Witt* standard, such a juror is subject to challenge for cause.

For example, a juror might automatically vote *for* the death penalty if the defendant had killed more than once, if the murder was premeditated, or if the victim was a child. Another juror might automatically vote *against* the death penalty if the defendant was less than 21 years old, if the defendant was merely an aider and abettor, if there was only 1 victim, or if the victim was a drug dealer. (As these examples indicate, this issue affects prosecution voir dire as well as defense voir dire. See *People* v. *Coleman* (1988) 46 Cal.3d 749, 763 [251 Cal.Rptr. 83, 759 P.2d 1260] ["the ruling on a challenge for cause when a prospective juror appears biased *in favor of* the death penalty [italics added] should be examined in light of the same *Witherspoon[-Witt]* standard"].) Because they hold fixed views that interfere with their duty to consider all circumstances relevant to penalty, such jurors are subject to challenge for cause under the *Witt* standard, and appropriate voir dire should be permitted to uncover such death penalty views.

The roots of the majority's apparently contrary view may be traced to *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

Before the standard announced in *Witherspoon* was "substantially modified" (*People* v. *Ghent, supra*, 43 Cal.3d 739, 767) by *Witt,* it was sometimes viewed as permitting a challenge for cause on the ground of bias *against* the death penalty *only* if a prospective juror's responses made it unmistakably clear that he or she would *always and in every case* vote against imposition of the death penalty. If this were now the proper standard, then the majority might be correct: death qualification voir dire could properly be limited to the views of the prospective jurors about capital punishment in the abstract, and questions regarding the facts of the case could properly be excluded.

But this court has never viewed even the *Witherspoon* standard as being so restrictive. For example, in *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], we concluded "that a court may properly excuse [for cause] a prospective juror who would automatically vote against the death penalty *in the case before him,* regardless of his willingness to consider the death penalty in other cases." (*Id.* at pp. 357-358, italics added; accord, *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1166 [259 Cal.Rptr. 701, 774 P.2d 730] [maj. opn. of Eagleson, J.].) A footnote in *Fields* may be construed as restricting this conclusion by suggesting that during the death qualification voir dire the prospective jurors should be informed only of the charges involved in the case, and not of the evidence to be introduced. (*People* v. *Fields, supra*, 35 Cal.3d 329, at p. 358, fn. 13.) But this limitation makes little sense since the scope of voir dire would then be dependent upon the level of detail in the charging document and, more importantly, as explained above, because it would allow many objectionable death penalty views to remain undiscovered. Our post-*Witt* decisions have not limited the death qualification voir dire to the prospective jurors' views on the death penalty either in the abstract or in the circumstances shown by the charges.

For example, in *People* v. *Rich* (1988) 45 Cal.3d 1036 [248 Cal.Rptr. 510, 755 P.2d 960], the defense objected to limitations imposed by the trial court on counsel's " 'use of the facts of [the] case to determine death penalty attitudes' " but then reached agreement with the prosecution to ask the following question: " 'If the facts in this case disclose that [defendant] is guilty of four separate murders and multiple rapes, including the murder of an eleven-year-old girl who was sexually abused and was killed by being thrown off a high bridge, would those facts trigger emotional responses in you that would make it hard to consider life imprisonment without possibility of parole, or would you under those circumstances vote for the death penalty?' " (*Id.* at pp. 1104-1105.) We stated that this question "fully comports with the law existing at the time the voir dire examination was held" (*id.* at p. 1105) and we did not suggest there was anything improper in the inclusion of specific factual detail.

And in *People* v. *Coleman, supra*, 46 Cal.3d 749, we held that a challenge for cause was improperly denied where the prospective juror unequivocally stated he would always vote for death in a case of premeditated murder. (*Id.* at pp. 766-768.) Two felony-murder special circumstances were alleged and found true; it does not appear from the opinion that the information expressly charged premeditation.

The permissible purposes of death qualification voir dire include exposing not only grounds for challenges for cause, but also grounds for exercise of peremptory challenges. As we explained in *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1224 [255 Cal.Rptr. 569, 767 P.2d 1047], counsel "should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds for a challenge for cause." We also explained that the trial court's discretion to limit death penalty voir dire is the same as its power to limit the general voir dire. In brief, voir dire may not be used to "educate or indoctrinate the jury" and the court has discretion to contain voir dire within these limits. (*Ibid.*; see also, *People* v. *Rich, supra*, 45 Cal.3d 1036, 1104-1105.) We noted approvingly in *Johnson* that the trial court "permitted a wide range of questions regarding prospective jurors' attitudes about the death penalty." (*Johnson, supra*, at p. 1225.)

The suggestion that the prospective jurors' attitudes toward the facts of the case should be explored only during the general voir dire seems clearly erroneous.

## IV.

Although I do not agree with the majority's conclusion that gasoline is not an explosive (see part V, *post*), even if that is true, it is both unnecessary and incorrect to conclude that the gasoline was not "delivered" by defendant in this case. First, if gasoline is not an explosive what difference does it make whether or not it was "delivered"?

Second, the majority's characterization of the word "deliver" is overly restrictive and unduly pejorative. Presuming a defendant kills with a "true" explosive, does the majority really mean to say he would be death eligible only if he walked up the sidewalk and put the explosive directly into either the mailbox or the recipient's hands? I think not. (See Webster's New Internat. Dict. (2d ed. 1957) p. 693: "deliver" means "To give or put forth in action or exercise; to discharge; as, to *deliver* a blow; to *deliver* a broadside or a ball." "Delivery" means "Act or manner of sending forth, discharging, or throwing . . . .")

Predictably, the majority's incorrect and unnecessary dictum will come back to haunt this court in deciding "true explosives" special-circumstance cases. And to what end?

## V.

I agree the "explosives" special-circumstance finding cannot be sustained, but not because gasoline is not an explosive within the meaning of Health and Safety Code section 12000 and Penal Code section 190.2, subdivision (a)(6) (hereafter, section 190.2(a)(6)). My conclusion is that gasoline comes literally with the statutory definition of "explosive," but because section 190.2(a)(6) applies only if the defendant knew or should have known that his use of an "explosive" created a great risk of death and because no instruction on defendant's intent or knowledge of the explosive character of gasoline was given, the explosives special-circumstance finding cannot be affirmed.

The People argue that defendant's use of the combination of gasoline vapor and air within the confines of the victims' bedroom meets the criteria of Health and Safety Code section 12000 and is therefore use of an explosive. They rely in part on that portion of Health and Safety Code section 12000 that broadly defines an explosive as a substance or combination of substances "the primary or common purpose of which is detonation or rapid combustion and which is capable of a relatively instantaneous or rapid release of gas and heat . . . ."[2]

The People concede that gasoline is intended principally for use as motor fuel; is not in and of itself necessarily an "explosive"; and, when uncontained, is designed to burn rather than explode. They argue, nonetheless,

[2]Section 12000 of the Health and Safety Code both broadly defines "explosives" and specifies particular substances that fall within its definition: In 1982 it provided in part: "[T]he term 'explosives' shall mean any substance, or combination of substances, the primary or common purpose of which is detonation or rapid combustion and which is capable of a relatively instantaneous or rapid release of gas and heat, or any substance, the primary purpose of which, when combined with others, is to form a substance capable of a relatively instantaneous or rapid release of gas and heat."

The People also suggest that gasoline is an explosive within the definition of Health and Safety Code section 12000 by virtue of the statutory incorporation by reference of schedules adopted by the administrative agencies named therein. Thus, it may be an explosive under the United States Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms' Notice 614, List of Explosives Materials, which includes any liquid that may explode. (51 Fed.Reg. 46979-46980 (Dec. 29, 1986).)

However, in view of my conclusion that gasoline falls within the express statutory definition of an explosive, I do not consider whether the electorate intended that section 190.2(a)(6) apply to substances identifiable only by virtue of their occasional inclusion in schedules of explosives adopted by federal as well as state administrative agencies for other purposes.

that the expert testimony establishes that gasoline as used by defendant, meets the statutory definition of an explosive: Vapor is released from the gasoline exposed to air. When ignited in the proper proportion the combination of gasoline vapor and air is capable of producing heat rapidly, and gas is also produced in the form of carbon monoxide and carbon dioxide. This meets the literal definition of an explosive established in Health and Safety Code section 12000 as a "substance . . . capable of a relatively instantaneous or rapid release of gas and heat." And, of course, as the evidence confirms, when this reaction occurs in a confined space an explosion occurs.

I am satisfied, therefore, that gasoline can be an explosive as that term is defined in Health and Safety Code section 12000. However, section 190.2(a)(6) applies only if the defendant knows or should know that his use of an "explosive" creates a great risk of death. Therefore, the defendant's intent to cause an explosion, and thus the knowledge he has or reasonably should have about the circumstances in which use of gasoline may cause a deadly explosion, must determine whether this special circumstance applies.

When uncontained gasoline is used in such a manner that a diffuse vapor explosion is possible on ignition, several variables outside the control or anticipation of the user may determine if the strength of the explosion is potentially lethal—the concentration of vapor which itself depends on the length of time the gasoline has been present, and the size of the area in which the ignition occurs. Not every gasoline generated fire is preceded by a life-threatening explosion. The harmful effects of igniting the vapor may range from a quick "flash burn" or sufficient burning of a structure and/or its contents to set them afire, to an explosive concussion that causes structural damage. Any of these effects may result in injury or death, but not all persons using gasoline to start a fire would anticipate or intend that an explosion occur.

Since section 190.2(a)(6) is limited by its terms to use of an "explosive" in circumstances in which the defendant knows or reasonably should know that his use of the "explosive" creates a great risk of death, but the felony-murder-arson special circumstance has no comparable limitation, it appears that the electorate did not intend that all arson-related deaths fall within the explosives special circumstance solely for the reason that gasoline was used as an accelerant in the commission of an arson and an explosion occurred when the vapor was lit.

Both the language of section 190.2(a)(6), and the statutory scheme within which it operates, thus support my conclusion that a murder in which the victim dies as a result of injuries suffered in a gasoline generated fire is a murder committed by means of an explosive only if the defendant used

gasoline with the intent to exploit its explosive nature and the concussive force of the vapor explosion to cause death or injury, or should have recognized that potential. He must intend that a potentially lethal explosion occur or must act in such a manner in his use of gasoline that he should know of the potential for such an explosion. It is not enough that an explosion and fire occur as a result of the defendant's acts.

Murder in the commission of arson, when the defendant uses gasoline to commit the arson, but does not intend that there be, or have reason to recognize the probability that there will be, a deadly explosion, therefore, is not within section 190.2(a)(6). This does not preclude the possibility that an arson-related death may be the predicate for a special circumstance. Uncontained gasoline is often used as an accelerant in the commission of arson, and murder in the commission of arson is itself a special circumstance directly related to use of gasoline as an accelerant in burning a structure. (§ 190.2, subd. (a)(17)(viii).) In construing the 1978 death penalty law, it is presumed the Legislature and/or electorate did not intend to create overlapping special circumstances. "[T]he court should construe special circumstance provisions to minimize those cases in which multiple circumstances will apply to the same conduct, thereby reducing the risk that multiple findings on special circumstances will prejudice the defendant." (*People* v. *Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]. See also *People* v. *Montiel* (1985) 39 Cal.3d 910, 927 [218 Cal.Rptr. 572, 705 P.2d 1248].)

Because the jury was not instructed that the special circumstance of murder by explosives (§ 190.2(a)(6)) required such intent or knowledge, and the evidence does not compel a conclusion that defendant had the requisite intent or knowledge, the finding that the murder was committed by the delivery of an explosive must be stricken.[3]

## VI.

I do not agree with the conclusion of the majority (maj. opn., *ante,* at pp. 608-609), that the trial court erred in declining to instruct on the basis of *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*), that "[t]o find the special circumstance [of murder in the course of arson] true, it must be proved that the murder was committed in order to carry out or advance the commission of the crime of arson or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance

---

[3] This conclusion makes it unnecessary to address defendant's claim that the trial court erroneously admitted demonstrative evidence of the manner in which gasoline vapor "explodes" when enriched with oxygen and ignited within a steel tube, evidence that was relevant only to establishing the truth of this special circumstance allegation.

referred to in these instructions is not established if the arson was merely incidental to the commission of murder." (See maj. opn., *ante,* at p. 607, fn. 14.)

In my view, the requested instruction was incorrect in two vital respects, notwithstanding it was based on CALJIC No. 8.81.17. *Green* did not hold or even state that *only* a murder for the purpose of advancing the independent felony could be a murder in the commission of a robbery for special circumstance purposes; it stated only that "it was not unconstitutionally arbitrary to expose to the death penalty those defendants who killed in cold blood in order to advance an independent felonious purpose . . . ." (*Green, supra,* 27 Cal.3d at p. 61.)[4]

Nor did *Green* hold that no robbery-murder special circumstance could be found merely because the defendant intended to kill rather than to steal. It stated that a robbery-murder special circumstance is inappropriate "when the defendant's intent is not to steal but to kill *and the robbery is merely incidental to the murder* . . . because its sole object is to facilitate or conceal the primary crime." (*Green, supra,* 27 Cal.3d at p. 61, italics added.) In applying its rule to the facts, and in stating its holding, the court in *Green* expressly quoted the concession of the Attorney General in that case: " 'It is true that this murder was the prime crime and that the robbery was incidental to that murder, since the underlying motive for the robbery was to leave Karen's corpse bereft of anything whatsoever by which she could be identified.' For the reasons stated, we hold this evidence insufficient as a matter of law to support the jury's finding of the truth of the robbery special circumstance alleged in count I." (*Id.* at p. 62.)

Shortly after *Green,* four members of this court in *People v. Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883] (*Thompson*), relying on no authority other than *Green,* completely misread *Green* as holding: "A murder is not committed during a robbery within the meaning of the statute *unless* the accused has 'killed in cold blood in order to advance an independent felonious purpose . . . .' " (Italics added, original italics omitted. *Thompson, supra,* 27 Cal.3d at p. 322.) *Thompson* did correctly state that "the . . . issue under *Green* is whether or not the perpetrator's intent to steal was 'merely incidental' to his intent to kill" (*Thompson, supra,* 27

---

[4] The *Green* court made this statement in express reliance on the provision in the 1977 death penalty act (former § 190.2, subd. (c)(6)) that felony-murder special circumstances could only be made when the murder was "willful, deliberate and premeditated." (*Green, supra,* 27 Cal.3d p. 61.) That requirement was deleted in the 1978 death penalty act and, in the case of an actual killer, is no longer a prerequisite to a felony-murder special-circumstance finding. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1138-1147 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Cal.3d at p. 323), but it misstated the holding in *Green* and therefore incorrectly applied the *Green* rule. Accordingly, it should be overruled.

Since the majority finds the arson in this case was not merely to facilitate the murder, it incorrectly holds that a *Green* instruction was required. As I discuss, *post,* I do not agree that the arson here was, as a matter of law, not committed to facilitate the murder. However, as will appear, I do not believe the fact the underlying felony was committed to facilitate the murder renders the underlying felony "incidental" or precludes a felony-murder special-circumstance finding.

On its facts the *Green* decision was clearly correct in concluding murder in the course of a robbery had not been proved. The only robbery, if indeed there was a robbery, was the defendant's ordering the victim to disrobe and placing her clothes in his vehicle before transporting her to a secluded area where he raped, sodomized and killed her. It was clear from the evidence and the prosecution argument that the only purpose for the "robbery" was to hinder identification of the victim, i.e., to conceal the murder. The *Green* court quite correctly concluded on these facts that there had been a robbery in the commission of a murder rather than a murder in the commission of a robbery. (27 Cal.3d at pp. 60, 62.)

Although the *Green* court in defining an "incidental" robbery during a murder stated it could be one the sole object of which "is to *facilitate* or conceal the primary crime" (*Green, supra*, 27 Cal.3d at p. 61, italics added), the question of facilitating the crime was not actually before the *Green* court in connection with the robbery, so its statement about "facilitating the primary crime" should not be considered binding. Significantly, the *Green* court did not apply the "facilitation" rule to invalidate the kidnap-murder special-circumstance finding the *Green* jury had also returned. Clearly, the purpose of the kidnapping was to facilitate the murder and if a death-eligibility felony may not be the basis of a special circumstance finding if its purpose was to facilitate the murder, that would have been an easy and obvious answer to the kidnap-murder special-circumstance finding in *Green.* The court, however, felt it necessary to discuss the sufficiency of the evidence of kidnapping at great length and considerable complexity, concluding ultimately the evidence was insufficient in view of instructional error. (*Id.* at pp. 62-73.)

In any event, I do not agree that a death-eligibility felony cannot give rise to a special circumstance finding merely because it was committed to facilitate the murder. First, such a felony cannot accurately be characterized as "incidental" to the murder in the sense the robbery in *Green* was only

"incidental."[5] The robbery in *Green* was "incidental" because it was peripheral—it had little or nothing to do with the murder; its only purpose was to conceal or delay identification of the victim. When one of the statutorily enumerated felonies is committed to facilitate the murder or make the murder possible, it has everything to do with the murder and invariably demonstrates a predetermined scheme and greater culpability in the willingness to commit multiple felonies to carry out that scheme.

Second, the rule that a statutory death-eligibility felony which "facilitates" the murder cannot give rise to a special circumstance finding leads to incomprehensibly nonsensical, absurd results. In the case at bench it would mean that if the defendant committed the arson with the express intent to kill all the occupants of the house, and succeeded in killing one, no arson-murder special-circumstance finding could be upheld and the defendant would not be death eligible, whereas if he committed the arson without intending to kill anyone but an occupant was inadvertently or accidentally killed in the fire, an arson-murder special circumstance would be proper and the defendant would be death eligible. The culpability-penalty relationship is thus turned upside down.[6]

The point is made equally vivid by considering the burglary-murder special circumstance. If the defendant commits the burglary with the intent to steal personal property, finds the resident at home and accidentally kills the resident in an ensuing struggle, a burglary-murder special-circumstance finding is appropriate and the defendant is death eligible. If the burglary is based on the defendant's entry with the intent to kill the resident, no burglary-murder special circumstance can be upheld because the burglary facilitated the murder and the defendant is not death eligible.

The majority concludes from defendant's testimony he intended the arson only to force the occupants out of the house so he could shoot David Gawronski in the presence of Ava Gawronski, that defendant had an independent felonious purpose and that no *"Green"* instruction[7] was required.

---

[5] Perhaps a more useful term for the *Green*-type underlying felony would be "peripheral."

[6] Contrary to the suggestion of Justice Broussard (see conc. and dis. opn. of Broussard, J., at p. 643, fn. 1), the legislative prescription of death eligibility for unintentional, actual killers who kill in the course of certain enumerated felonies is not itself absurd, irrational or unconstitutionally arbitrary. (See *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1138-1147.) The application of felony-murder special circumstances to unintentional, though actual, killers is a legislative assessment of culpability which the courts are not free to disregard. Accepting that premise, as we must, and given that the principle at issue in determining death eligibility is a determination of individual culpability, the use of court-created fictions to render felony-murder special circumstances inapplicable to *intentional* killers otherwise engaging in the same conduct as an unintentional killer is both an absurdity and a usurpation of the legislative power.

[7] It would be far more appropriate to call the *"Green"* instruction the *Thompson* instruction. (See discussion of *Thompson*'s misreading of *Green, ante.*)

However, that same testimony would establish that the arson was intended by defendant only to facilitate the murder of David Gawronski, and as analyzed by the majority I cannot agree with its conclusion that the arson was, as a matter of law, not intended to "facilitate" the murder. In the burglary-murder case, it is necessary to get into the residence to kill the victim; here, the arson's purpose, if defendant is to be believed, was to drive the victim out of the house so he could be killed. What is the difference?

The answer is that the "facilitation" rule is wrong. It is based on a misunderstood dictum in *Green* and has been improvidently accepted with little reasoning or discussion in later cases. The decision in this case should put an end to this mischievous misunderstanding.

## VII.

I agree with the majority's refusal to extend the *Ireland*[8] -*Wilson*[9] -*Sears*[10] "merger" fiction to special circumstance law (maj. opn., *ante,* at p. 609, fn. 15) but not with the reason given for its refusal. The reasons I would not extend the fiction are two-fold. First, extension of the "merger" fiction to felony-murder special-circumstance law would produce the very same nonsensical, absurd results produced by the "facilitation" rule found in the *Green* dictum and *Green*'s progeny. (See, e.g., *People v. Farmer* (1989) 47 Cal.3d 888, 915 [254 Cal.Rptr. 508, 765 P.2d 940]; *People v. Garrison* (1989) 47 Cal.3d 746, 778 [254 Cal.Rptr. 257, 765 P.2d 419].) (See discussion, *ante.*)

Second, even if the adoption in *Ireland* of the "merger" fiction was appropriate in the context of the court-created second degree felony-murder rule, and even if the extension of the merger fiction to statutorily prescribed first degree murder was appropriate in *Wilson,* which I doubt, its further extension to special circumstance law would be wholly improvident. The felony-murder special circumstances enumerated in section 190.2, subdivision (a)(17) constitute a legislative determination that a killing during the commission of one of the enumerated felonies is sufficiently culpable to render the actual killer death eligible whether the killing was intentional or unintentional. (*People v. Anderson, supra*, 43 Cal.3d 1104, 1138-1147.) Absent unconstitutionality the courts are not at liberty to apply legal fictions to circumvent legislative assessments of culpability and indeed, as I have shown, the result of disallowing the statutorily prescribed special-circumstance finding when the underlying felony was a means of facilitating the

---

[8] *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].

[9] *People v. Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22].

[10] *People v. Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847].

murder stands the legislative culpability-penalty relationship on its head, making the more culpable ineligible for the death penalty and the less culpable death eligible. If this court were to extend the "merger" fiction to achieve this irrational result it would not only put in question its collective judgment but also put in question the rationality and thus the constitutionality of the felony-murder portion of the state's death penalty law.

## VIII.

I conclude the judgment should be affirmed in its entirety.

Appellant's petition for a rehearing was denied June 7, 1990, and the opinion was modified to read as printed above.